# Illinois Official Reports

## Supreme Court

***People v. Simpson*, 2015 IL 116512**

| | |
|---|---|
| Caption in Supreme Court: | THE PEOPLE OF THE STATE OF ILLINOIS, Appellant, v. MARCEL SIMPSON, Appellee. |
| Docket No. | 116512 |
| Filed | January 23, 2015 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Where an accused's purported confession to a murder was reiterated in a recorded statement made by an individual who had not seen the offense and who testified that he did not remember what the defendant had said, a new trial was required after that recording was played for the jury without objection, since the "event" as to which the witness's personal knowledge would statutorily permit the admission of his prior inconsistent statement was the crime itself, rather than the confession—ineffective assistance of counsel. |
| Decision Under Review | Appeal from the Appellate Court for the First District; heard in that court on appeal from the Circuit Court of Cook County, the Hon. Thomas V. Gainer, Jr., Judge, presiding. |
| Judgment | Affirmed. |

Counsel on
Appeal

Lisa Madigan, Attorney General, of Springfield, and Anita Alvarez, State's Attorney, of Chicago (Alan J. Spellberg, Michelle Katz, and Janet C. Mahoney, Assistant State's Attorneys, of counsel), for the People.


Michael J. Pelletier, State Appellate Defender, Alan D. Goldberg, Deputy Defender, and Megan E. Ledbetter, Assistant Appellate Defender, of the Office of the State Appellate Defender, of Chicago, for appellee.


Justices

JUSTICE THOMAS delivered the judgment of the court, with opinion.
Chief Justice Garman and Justices Freeman, Kilbride, Karmeier, Burke, and Theis concurred in the judgment and opinion.

**OPINION**

¶ 1    Following a jury trial in the circuit court of Cook County, defendant, Marcel Simpson, was convicted of first degree murder in connection with the beating death of Phillip Thomas. At defendant's trial conducted in October 2010, Vonzell Franklin testified that he was near the crime scene on the date of the murder in May 2006, but did not recall what defendant said to him or what he told police that night. The State then admitted Franklin's videotaped statement to police in which he stated that defendant told him that he had hit the victim 30 times with a bat. The State emphasized the statement in its closing argument. The appellate court reversed defendant's conviction and remanded for a new trial, finding that defense counsel was ineffective in failing to object to the introduction of Franklin's statement where the "personal knowledge" requirement for admission of a prior inconsistent statement was not satisfied under section 115-10.1(c)(2) of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/115-10.1(c)(2) (West 2010)). 2013 IL App (1st) 111914. We granted the State's petition for leave to appeal (Ill. S. Ct. R. 315 (eff. July 1, 2013)), and we now affirm the judgment of the appellate court.

¶ 2                                    BACKGROUND
¶ 3    The State's theory at trial was that Thomas was beaten to death by six men: defendant, Antonio Morris, Larrone Wallace, Johnny Graves, Dwayne Powell and Dwayne Thompson. According to the State's evidence, the beating occurred in retaliation for a prior beating that Thomas delivered to Powell, which resulted in Powell losing several teeth. Defendant and

three codefendants—Morris, Wallace and Graves—were charged with first degree murder in connection with the death of Thomas. Powell and Thompson were never charged. Wallace pled guilty to second degree murder in 2007, and Graves pled guilty to conspiracy to commit murder in 2009. Defendant and Morris were tried jointly and both were convicted of first degree murder.

¶ 4     At trial, the State called one occurrence witness who was not implicated in the offense: 74-year-old Jesse Rucker. Rucker testified that on the evening of May 8, 2006, he was doing repair work on the second floor of his home at 123 North Waller Avenue, in Chicago, when he heard a loud noise coming from an alley to the north between Waller and Parkside. Rucker turned and saw two or three men chasing another man down the alley. Two vehicles, a Chevy and a Ford Bronco, were following behind the men. When the men on foot turned out of the alley into a vacant lot to the north of Rucker's house, the Chevy followed them, while the Bronco continued down the alley and then west toward Waller.

¶ 5     Rucker then went to a bedroom window, overlooking Waller Avenue, to see what was going on. At that point, he saw six men beating the victim, who was lying in the street. He saw the two vehicles, but nobody was left in them. The victim was being beaten by men wielding one object that looked like a bat and another object that looked like a tire tool or a crowbar. All of the six men took turns using the metal objects to beat the victim.

¶ 6     As the beating continued, Rucker left his second-floor bedroom window and went downstairs to his front porch. Rucker then saw the victim attempt to slide himself under a car, but the men pulled him out and continued to beat him.

¶ 7     At some point, Rucker called the police. The men eventually stopped beating the victim and left in the vehicles. Police arrived moments later. Rucker gave a general description to police of the attackers as "six black males."

¶ 8     From pictures shown to him at trial, Rucker identified the Chevy and Ford in which the perpetrators came to and left the scene of the beating. Rucker further testified that he spoke with police who showed him photographs, and he identified Powell as one of the offenders. Rucker did not identify Thompson from the photos. A few days later, Rucker went to the police station and viewed lineups. There, he identified Morris as the driver of the Ford, Wallace as the driver of the Chevy, and defendant as one of the offenders who chased Thomas on foot. Rucker stated that all three of them beat Thomas. Rucker was unable to identify Graves or Powell in the lineups in which they were present. Moreover, Rucker was unable to identify either defendant or codefendant Morris in court, stating that he did not see anyone in court that he had picked out of the lineups.

¶ 9     On cross-examination, Rucker testified that when he saw the three men chasing the victim through the alley, they were within five or ten feet from his house and he "could see them very well." He stated that he was almost 100% sure of his lineup identifications and did not recall telling an investigator that he was only 90% sure of his lineup identifications. Rucker acknowledged that he lost sight of the men who ran through the alley when he changed vantage points. He explained that he saw them when they were within reaching distance of the victim, but then he ran from the back of his house to the front, and this did not take more than a minute and a half. By this time, the men had the victim on the ground and circled. They then proceeded to pass the bat and crowbar from one to another to beat him. Rucker did not know if any

particular offender struck the victim more than once, but he was sure each one of them used both the bat and crowbar.

¶ 10   The State's two other occurrence witnesses, Graves and Thompson, were, according to the State's own theory, accomplices in Thomas's murder. As noted above, Graves pled guilty to a lesser charge in exchange for his truthful testimony and a recommended sentence of 14 years. Graves testified that on May 8, 2006, he rode with Morris as they took defendant to a store. Graves saw Thomas get off the "L" train. Graves knew Thomas had beaten up Powell, a friend of Graves, Morris and defendant. Morris made a phone call while Graves went into the store to find defendant. Graves, Morris and defendant then searched the neighborhood looking for Thomas. They met Thompson, Powell and Wallace in a car Thompson's girlfriend owned. Graves spotted Thomas again. Defendant and Powell then got out of the cars and chased Thomas, with the cars joining the pursuit. When he got close to Thomas, defendant threw a metal bar at him. Graves got out of the car and started hitting Thomas, who fell. At that point, all six of the men struck Thomas repeatedly with the bar and a bat. They then left the area in two cars.

¶ 11   Thompson was not charged in connection with the crime even though Graves implicated him. Thompson testified at trial that he rode with Wallace in his girlfriend's Chevy Cavalier on May 8, 2006. They were near Waller and West End when Thompson saw Morris alone in his Ford Bronco. Thompson stated that he was not close enough to "the situation" to see what was happening and that he did not see anyone running. Moreover, he testified that he saw no beating, and he did not say most of the things attributed to him in a written statement he signed at the police station in the fall of 2007.

¶ 12   The State then called Assistant State's Attorney Phyllis Porcelli to read a statement that Thompson gave to her and signed on October 24, 2007, while he was in custody in another county in connection with an unrelated matter. According to the statement, Graves called Wallace and told him that they were chasing Thomas. Thompson then drove Wallace to the area of Waller and Lake. At that point, Thompson saw Thomas running in an alley between Parkside and Waller. Defendant and Powell were chasing Thomas, and Morris's orange Bronco was following behind Thomas. Graves exited the Bronco and joined the foot pursuit of Thomas. Thompson got out of the car and watched defendant and Morris beating Thomas.

¶ 13   According to Thompson's statement, neither he nor Wallace participated in the beating. He also did not see Powell participating. Thompson did see defendant hit Thomas with a bat multiple times, and after one of those hits, heard a sound like "a turtle shell cracking." He also heard a little girl exclaim that they had killed Thomas. Thompson and Wallace then left in the Chevy.

¶ 14   Vonzell Franklin testified that he spoke to defendant on the evening of May 8, 2006. He stated that he could not remember what defendant had told him about an event involving Phillip Thomas that had occurred earlier that day. Franklin remembered talking to police about what defendant had told him, but Franklin did not recall what he said to the police. He agreed that he probably told the police that he saw defendant talking with Shinesha Houston in an alley. He also agreed that he told police that defendant had told him that he caught Thomas, *i.e.,* "he caught that n*** Phil man." When Franklin was asked what defendant told him they did specifically when they caught Phillip Thomas, Franklin responded, "I don't remember *** [i]t's been five years." When asked if he told the police that defendant had told him that

defendant bashed Thomas's head in and hit Thomas about 30 times with a bat, Franklin stated that "a lot was said to the cops and I don't remember exactly what was said, so I really can't answer that question."

¶ 15 Franklin further testified that he remembered the police threatening to charge him with Thomas's murder if he did not tell the police something about what happened. He wanted to tell the police something to avoid being charged. He was never charged with a crime. He also testified that he directed the police to the location where Morris's Bronco could be found.

¶ 16 Chicago police detective John Valkner testified that Franklin was arrested on May 13, 2006, and released within 24 hours. On May 14, 2006, around 1:30 a.m., Valkner spoke with Franklin about a conversation that Franklin had with defendant in an alley on May 8, 2006, about the beating death of Thomas. The conversation was recorded and three clips from the recording were played for the jury. In that recording, Franklin told the police that defendant stated, "we beat the f*** out of that n*** man I think he dead. We bashed his head in *** I hit him about 30 times with a bat." Later, Franklin added that defendant said, "these n***s acting all soft *** and I think I'm gonna have to snatch the bat from these n***s."

¶ 17 Chicago police detective James Gilger testified that following his conversation with Franklin, he, Valkner and Franklin went to an address at Franklin's direction where Franklin identified an orange Bronco. Morris was the registered owner of the Bronco, and Gilger arranged for it to be towed and inventoried. A forensic investigator processed the Bronco. He found and inventoried a metal bar with a barbell collar on it that he discovered between the driver's seat and the center console. Gilger also located the Cavalier and arranged for it to be towed and inventoried. The state crime lab did not find any fingerprints or blood on the metal bar with the barbell collar, nor did it find any blood in the Bronco or Cavalier.

¶ 18 The parties stipulated that Thomas died from multiple craniocerebral injuries caused by blunt force trauma. Specifically, Thomas suffered five comminuted fractures to his skull and ten brain contusions. Aside from a small abrasion on his right shoulder and a minor scrape on his left finger, there were no cuts or gashes on Thomas's body.

¶ 19 After the State rested, Larrone Wallace testified on behalf of defendant that on May 8, 2006, around 5:15 p.m., he was a passenger in a Cavalier driven by Thompson. They were in the area of Waller Avenue chasing Phillip Thomas with the car. Morris's Bronco also participated in the chase. Wallace saw Morris, defendant, Graves, Thompson, and Powell during the chase. Wallace stated that he exited the car and hit Thomas at least twice with the bat. Wallace could not remember if he struck Thomas in the head.

¶ 20 On cross-examination, Wallace stated that there were a lot of people present when Thomas was beaten, and he could not state who was present and who was not. He further stated that he did not know whether anyone else hit Thomas with a bat or a bar. Wallace then acknowledged that, previously, he testified under oath that three people on foot and two cars chased Thomas. Wallace further acknowledged that he had testified that defendant, Morris, Graves, Thompson, and Powell kicked and punched Thomas and hit Thomas with weapons.

¶ 21 Quentin Hall testified that he was an investigator for the defense. Hall noted that when he interviewed Rucker in January 2007, Rucker said he was 90% sure of his lineup identifications. Hall also said that he measured the distance from Rucker's window to the location where the victim ended up at 164 feet.

¶ 22    Shinesha Houston testified that she knew both defendant and Franklin. She testified that she was not in an alley with defendant and Franklin on May 8, 2006. She also did not hear defendant tell Franklin that defendant participated in Thomas's murder.

¶ 23    During closing argument, the prosecutor emphasized all of the evidence presented against defendant, including Rucker's positive identification out of a physical lineup conducted a few days after the crime and the opportunity Rucker had to view defendant from close range as he ran past his house. She also emphasized that all of the testimony from defendant's accomplices that implicated defendant in the crime was largely corroborated by Rucker's testimony. The prosecutor further mentioned Franklin's videotaped statement at a few points during her argument. For example, she noted that Franklin's statement was further corroboration that defendant was there, as it is a statement of defendant boasting about the crime shortly after it happened "while the adrenalin is still in him."

¶ 24    The jury found defendant and Morris guilty of first degree murder. The trial court sentenced defendant to 36 years and six months in prison. Defendant and Morris filed separate appeals that were reviewed by different panels of the appellate court.

¶ 25    On appeal, defendant argued that his trial counsel rendered ineffective assistance by failing to object to the introduction of the video recording of Franklin's discussion with police wherein he claimed that defendant admitted to beating Thomas. The State conceded that if defense counsel had objected to the recording, the court would not have admitted it to impeach Franklin because his testimony did not affirmatively damage the State's case. See *People v. Cruz*, 162 Ill. 2d 314, 359-60 (1994). The State argued, however, that the trial court correctly permitted the jury to hear the recording as substantive evidence under section 115-10.1 of the Code, because the statement "narrates, describes, or explains an event or condition of which the witness has personal knowledge." See 725 ILCS 5/115-10.1(c)(2) (West 2010). The appellate court rejected the State's argument, finding that "[f]or a witness's out-of-court statement to satisfy the personal knowledge requirement, the witness must have actually seen the events that form the subject matter of the statement." 2013 IL App (1st) 111914, ¶ 18 (citing *People v. McCarter*, 385 Ill. App. 3d 919, 930 (2008)). The appellate court then found that counsel was ineffective because there was no sound strategic reason for counsel's failure to object to the recording of Franklin's statement (*id.* ¶ 19) and there was "a reasonable likelihood that [counsel] would have achieved a better result" if he had objected (*id.* ¶ 22). Accordingly, the appellate court reversed defendant's conviction and remanded the case for a new trial. *Id.* ¶ 24.

¶ 26                                            ANALYSIS

¶ 27    It is a well settled general rule that what a witness states out of court and out of the presence of the defendant is pure hearsay and is incompetent as substantive evidence. *Cruz*, 162 Ill. 2d at 359. However, section 115-10.1 of the Code allows a party to use a witness's prior inconsistent statement as substantive evidence under certain circumstances. *Id.* Section 115-10.1 provides in relevant part as follows:

        "In all criminal cases, evidence of a statement made by a witness is not made inadmissible by the hearsay rule if

                (a) the statement is inconsistent with his testimony at the hearing or trial, and

                (b) the witness is subject to cross-examination concerning the statement, and

- 6 -

(c) the statement—

   ***

(2) narrates, describes, or explains an event or condition of which the witness had personal knowledge, and

   * * *

(C) the statement is proved to have been accurately recorded by a tape recorder, videotape recording, or any other similar means of sound recording." 725 ILCS 5/115-10.1 (West 2010).

¶ 28     The State argues that the appellate court misconstrued the statute when it found that Franklin must have had personal knowledge of the event described in the statement, *i.e.*, the beating of Thomas, for Franklin's out-of-court statement to be admissible. The State argues that the "event" in question is the defendant's verbal admission to Franklin, and therefore the witness only need have personally observed that conversation. In the State's view, the meaning of the language used in the statute is plain and clear. Defendant counters that the statutory language is ambiguous because it does not definitively answer whether the making of the statement, or the crime itself, or both alike, are the "event." Defendant maintains that the State's interpretation ignores that the crime is also an event and arbitrarily assumes that the admission is the only event subject to the personal knowledge requirement. Moreover, the State's reading is contrary to the legislative intent, purpose and history, and is contrary to numerous appellate court decisions that have rejected the State's interpretation.

¶ 29     We note that the interpretation of a statute presents a question of law, subject to *de novo* review. *People v. Woods*, 193 Ill. 2d 483, 487 (2000). The primary objective of statutory construction is to ascertain and give effect to the true intent of the legislature. *Id*. This inquiry must begin with the language of the statute itself, which is the most reliable indicator of legislative intent. *People v. Marshall*, 242 Ill. 2d 285, 292 (2011). A court must also consider the reason and necessity for the law, the evils to be corrected, and the objects and purposes to be obtained. *Woods*, 193 Ill. 2d at 487. A statute should be interpreted so that no part is rendered meaningless or superfluous. *People v. Perry*, 224 Ill. 2d 312, 323 (2007). We also give the statutory language the fullest, rather than the narrowest, possible meaning to which it is susceptible. *People v. Conick*, 232 Ill. 2d 132, 138 (2008).

¶ 30     It is axiomatic that where statutory language is capable of being understood by reasonably well informed persons in two or more different ways, the statute will be deemed ambiguous. *Marshall*, 242 Ill. 2d at 292. If a statute is ambiguous, we may consider sources other than its language, including legislative history, to determine the intent. *Id*.; *Woods*, 193 Ill. 2d at 488; *In re Marriage of Logston*, 103 Ill. 2d 266, 279 (1984). Moreover, it is a long-established principle of statutory construction that where terms used in a statute have acquired a settled meaning through judicial construction and are thereafter retained by the legislature without any correction or change, courts will presume that the legislature has chosen to acquiesce to the judicial construction placed on the terms. *People v. Young*, 2011 IL 111886, ¶ 17; *R.D. Masonry, Inc. v. Industrial Comm'n*, 215 Ill. 2d 397, 403-04 (2005); *In re Marriage of O'Neill*, 138 Ill. 2d 487, 495-96 (1990); 2A Norman J. Singer, Sutherland on Statutory Construction § 46:04, at 152-53 (6th ed. 2000) ("if the term utilized has a settled legal meaning, the courts will normally infer that the legislature intended to incorporate the established meaning").

¶ 31    We begin with the specific statutory language under scrutiny. In order to be admissible, the out-of-court statement must narrate, describe or explain an "event or condition," and the witness must have "personal knowledge" of that event or condition. A couple of questions arise from this language with respect to the classic case where a witness has made a custodial statement narrating the defendant's alleged admission to criminal acts, which are not themselves within the declarant's personal knowledge. The statute does not answer whether the making of the statement qualifies as an event. Nor does it answer whether the "personal knowledge" requirement necessitates that the declarant observe the events described in the statement or whether it is sufficient that he observed the making of the statement. The State contends that the ordinary meaning of "event" is "something (especially something important or notable) that happened." The State posits that an admission by a defendant is something notable, therefore the "event" for purposes of the statute must be the defendant's admission. The problem with the State's reasoning is that it could just as easily be said that the crime itself is an "event" because it is something notable that happened, and therefore when a witness makes a prior inconsistent statement describing an admission to a crime, the crime is the "event" subject to the personal knowledge requirement. The statute thus appears to be susceptible to two reasonable interpretations and therefore ambiguous. Furthermore, under the State's interpretation, the "personal knowledge" requirement appears to serve no purpose because, even without subsection (c)(2), witnesses could not testify to any out-of-court statements if they did not hear or otherwise witness the speaker making the statements. *People v. Hobson*, 2014 IL App (1st) 110585, ¶ 24; *People v. Wilson*, 2012 IL App (1st) 101038, ¶ 41 ("[T]he State's interpretation of the statute would essentially render the personal knowledge language superfluous, as '[p]ersonal knowledge of the existence of the statement is already required under the rubric of authentication.' Michael H. Graham, Graham's Handbook of Illinois Evidence § 801.11 (10th ed. 2010)."). Under these circumstances, then, we reject the State's argument that the statutory language is plain and clear in favor of the interpretation it proposes.

¶ 32    We also reject the State's argument that it is the legislative intent to require that the witness simply have personal knowledge of the defendant's admission, and not the crime being described, for a prior inconsistent statement to be admissible. Numerous decisions of our appellate court have rejected the precise argument the State makes here and have instead concluded that the prior inconsistent statement is not admissible unless the witness actually perceived the events that are the subject of the statement or admission. See, *e.g.*, *People v. Coleman*, 187 Ill. App. 3d 541, 550 (1989); *People v. Cooper*, 188 Ill. App. 3d 971, 972-73 (1989); *People v. Saunders*, 220 Ill. App. 3d 647, 658-59 (1991); *People v. Williams*, 264 Ill. App. 3d 278, 288-91 (1993); *People v. Hubbard*, 276 Ill. App. 3d 98, 103-05 (1995); *People v. Morales*, 281 Ill. App. 3d 695, 700-01 (1996); *People v. Fields*, 285 Ill. App. 3d 1020, 1028 (1996); *People v. Wilson*, 302 Ill. App. 3d 499, 507-10 (1998); *People v. Morgason*, 311 Ill. App. 3d 1005, 1010-13 (2000), *appeal denied*, 189 Ill. 2d 697 (2000); *People v. Bueno*, 358 Ill. App. 3d 143, 157-58 (2005); *People v. Harvey*, 366 Ill. App. 3d 910, 921-22 (2006); *People v. McCarter*, 385 Ill. App. 3d 919, 930-32 (2008); *People v. Fillyaw*, 409 Ill. App. 3d 302, 311-16 (2011); *People v. McCarter*, 2011 IL App (1st) 092864, ¶¶ 54-57; *People v. Wilson*, 2012 IL App (1st) 101038, ¶¶ 38-42; *People v. Donegan*, 2012 IL App (1st) 102325, ¶¶ 32-38; *People v. Hobson*, 2014 IL App (1st) 110585, ¶¶ 22-25; see also *People v. Sangster*, 2014 IL App (1st) 113457, ¶ 60 (approving of the same understanding of "personal knowledge" in

*dicta*). These decisions have generally rested their interpretation of the statute on the "unusually detailed legislative history," and the fact that the State's reading would keep the personal knowledge requirement from doing what it was designed to do—ensure that out-of-court statements are trustworthy. See *Wilson*, 2012 IL App (1st) 101038, ¶¶ 39-40.

¶ 33    Given the quarter of a century that the appellate court has repeatedly and consistently interpreted the statute as noted above, it seems clear that the statute has a settled meaning and it would not be appropriate for us to change it (see *Young*, 2011 IL 111886, ¶ 16), especially in light of the State's less than persuasive argument for a contrary interpretation.[1] We note, however, that if the legislature disagrees with the interpretation placed on section 115-10.1(c)(2) by the courts, it should of course feel free to amend the statute.

¶ 34    In the present case, the State used Franklin's videotaped statement as substantive evidence that defendant struck Thomas numerous times with a bat. Given that Franklin had no personal knowledge of the beating allegedly delivered by defendant, Franklin's out-of-court videotaped statement was not given the imprimatur of admissibility by section 115-10.1. Accordingly, we conclude that if defense counsel would have objected to Franklin's videotaped statement, he could have precluded it from being introduced into evidence.

¶ 35    We now turn to the question of whether defendant's trial counsel rendered ineffective assistance in failing to object to the video's introduction. To show ineffective assistance of counsel, a defendant must demonstrate that "his attorney's representation fell below an objective standard of reasonableness and that there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different." *People v. Patterson*, 192 Ill. 2d 93, 107 (2000) (citing *Strickland v. Washington*, 466 U.S. 668, 687, 695 (1984), for this test). A "reasonable probability" is defined as "a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. A defendant must satisfy both prongs of the *Strickland* test and a failure to satisfy any one of the prongs precludes a finding of ineffectiveness. *Patterson*, 192 Ill. 2d at 107.

¶ 36    Here, we can envision no strategic reason for defense counsel's failure to object to Franklin's videotaped statement to police. Franklin basically told police that defendant confessed to beating the victim to death. It has been observed that "a confession is the most powerful piece of evidence the State can offer, and its effect on a jury is incalculable." *People v. R.C.*, 108 Ill. 2d 349, 356 (1985). Moreover, we agree with the appellate court's conclusion that the confession in this case highlights defendant's brutality and his role as the leader of the men who beat Thomas. 2013 IL App (1st) 111914, ¶ 19. We also note that counsel allowed the court to instruct the jury that it had received evidence of a statement made by defendant and allowed the prosecutor to argue the confession as substantive evidence of defendant's guilt during closing argument. Under these circumstances, we believe that defendant has shown that his counsel's representation fell below an objective standard of reasonableness.

---

[1]The State attempts to counter the voluminous number of appellate decisions rejecting its argument by claiming that in *People v. Thomas*, 178 Ill. 2d 215 (1997), this court left open the question of how the personal knowledge requirement should be interpreted. We find the State's reliance upon *Thomas* unavailing. There, we merely reviewed any error concerning the admission of a prior inconsistent statement under the plain error doctrine and did not analyze whether the statement was admissible under the statute. We did nothing to negate or to cast doubt upon the appellate court's previous interpretations of the "personal knowledge" requirement of the statute.

¶ 37        We next consider whether defendant satisfied the prejudice prong of the *Strickland* test, *i.e.*, whether defendant has established that there is a reasonable probability that, but for counsel's error, the result of the proceeding would have been different. We view this as a close question. There was certainly ample evidence, even without any mention of defendant's confession, from which a rational trier of fact could have concluded that defendant was guilty beyond a reasonable doubt. Rucker was an eyewitness to the crime. He observed three of the six men who beat the victim run by within 10 feet of him while he stood viewing them from a second-floor window. He testified that he could see those men "very well." A few days after the crime, Rucker identified one of the men who ran past him on his way to beating the victim as the defendant. Rucker testified that he was 100% sure of his lineup identifications. Rucker's testimony was largely corroborated by the testimony of the accomplice witnesses, as well as defendant's own witness, Wallace, who also placed defendant at the scene of the crime.

¶ 38        The appellate court discounted Rucker's testimony in part because he was "a 74-year-old man [who] watched the beating from more than 150 feet away [and] admitted his eyesight was not good." Our review of the record, however, reveals no trouble with Rucker's ability to see at a distance. The brief reference in the record to Rucker's eyesight was only in relation to his ability to read print. Otherwise, his testimony is that of a man that did not have any trouble observing details at a distance. The appellate court also overlooked that Rucker testified that he saw three of the men, including defendant, while they were within 5 to 10 feet of him. Finally, we certainly do not believe a distance of a mere 50 to 55 yards would be too great to accurately view men swinging a bat at a human body.

¶ 39        On the other hand, we find that there are factors present to indicate a reasonable probability exists that, but for counsel's error in not keeping out the confession, the result of the proceeding would have been different. Again, the supposed confession was a powerful piece of evidence that indicated defendant's chief role in the victim's death and the State used it to full effect. We also note that Rucker was not able to identify either defendant or codefendant Morris at trial. This is perhaps understandable given the passage of four and a half years from the time of the crime to the trial, but it is nevertheless a significant factor that tilts the analysis toward a finding that there is a reasonable probability of a different outcome. We also add that there was some evidence presented that Rucker had told an investigator a year after the crime that he was only 90% sure of his lineup identifications. Finally, the trier of fact would be entitled to view the testimony of the accomplices with some skepticism given that they all received lighter treatment from the justice system. And this would be especially so to the extent that any promises of leniency or immunity induced their testimony. In sum, we hold that defendant has shown a reasonable probability that the result of the proceeding would have been different without counsel's errors.

¶ 40                                              CONCLUSION

¶ 41        For the reasons noted above, we hold that the appellate court correctly determined that in order for a prior inconsistent statement to be admissible under section 115-10.1 of the Code, the witness must have actually perceived the events that are the subject of the statement, not merely the statement of those events made by the defendant. Furthermore, defendant has shown that his attorney provided objectively unreasonable assistance when he failed to object to the prior inconsistent statement in question. Defendant has also established that there is a

reasonable probability that the result of the trial would have been different if counsel had been effective. Accordingly, we affirm the judgment of the appellate court, which reversed defendant's conviction and remanded the case for a new trial.

¶ 42          Affirmed.