NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2022 IL App (4th) 190710-U

NO. 4-19-0710

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
January 13, 2022
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Champaign County |
| OCTAVIUS J. JACKSON, | ) | No. 18CF1530 |
| Defendant-Appellant. | ) | |
| | ) | |
| | ) | Honorable |
| | ) | Thomas J. Difanis, |
| | ) | Judge Presiding. |

PRESIDING JUSTICE KNECHT delivered the judgment of the court.
Justices DeArmond and Holder White concurred in the judgment.

**ORDER**

¶ 1     *Held*: The appellate court affirmed, concluding defendant had not shown plain error or ineffective assistance of counsel.

¶ 2     Following a jury trial, defendant, Octavius J. Jackson, was convicted of criminal sexual assault and sentenced to eight years' imprisonment. Defendant appeals from his conviction and sentence, complaining about (1) the State's purported elicitation and use of multiple inadmissible hearsay statements of the complaining witness to bolster the witness's credibility, and (2) the trial court's purported imposition of an excessive sentence. Defendant acknowledges his failure to raise these issues below results in their forfeiture for purposes of appeal but requests the issues be reviewed under the plain-error doctrine and as a matter of ineffective assistance of counsel. For the reasons that follow, we affirm.

¶ 3                                              I. BACKGROUND

¶ 4                                              A. Information

¶ 5          In November 2018, the State charged defendant by information with one count of criminal sexual assault (720 ILCS 5/11-1.20(a)(2) (West 2016)). The State alleged, on October 14, 2018, defendant used his fingers to penetrate the vagina of A.F. without her consent.

¶ 6                                              B. Jury Trial

¶ 7          In August 2019, the trial court conducted a jury trial.

¶ 8                                              1. *A.F.*

¶ 9          A.F. testified, on October 13, 2018, she lived in a one-bedroom apartment with her boyfriend, who she had been in a dating relationship with "[o]n and off since 2015." That evening, she and her boyfriend were at the apartment listening to music and drinking alcohol. A.F. specifically began drinking alcohol around 8 p.m., drinking tequila out of a half-pint bottle and "chasing it" with a Monster energy drink. Later that evening, defendant, who A.F. identified in the courtroom, came over to the apartment to hang out with A.F.'s boyfriend. A.F. testified defendant was her boyfriend's friend and lived in an apartment below their apartment. She further testified she had seen defendant on two prior occasions and knew him as "O.J."

¶ 10         Around 11:30 p.m., A.F. drove her boyfriend and defendant to the store, where defendant purchased a bottle of tequila. The three then returned to the apartment. A.F.'s boyfriend and defendant sat at a table and talked and drank alcohol, while A.F. sat on a couch and listened to music and drank alcohol. A.F. had finished her half-pint bottle of tequila, which A.F. believed amounted to four or five shots, and A.F.'s boyfriend refilled the bottle with the tequila from the bottle defendant purchased. A.F. continued drinking for about an hour or so after returning to the apartment. She drank some, but not all, of the refilled bottle of tequila. Around 4 a.m. on October

14, 2018, A.F. went to her bedroom to go to sleep. A.F.'s boyfriend followed A.F. into the bedroom and stayed with her until she fell asleep. A.F. believed her boyfriend left the bedroom to continue to hang out with defendant after she fell asleep.

¶ 11 Around 7 a.m., A.F. woke up to the feeling of something inside her vagina. She then observed defendant on her bed with his hands under the sheets and fingers inside her vagina. A.F. testified, despite it being dark, she could identify defendant based upon his face, clothing, and shoes. With respect to his clothing and shoes, A.F. specifically testified defendant was wearing the same grey shirt, blue jean pants, and Nike shoes that she observed him to be wearing earlier that evening. A.F. testified, after observing defendant, defendant told her "to shush." She then "pushed" defendant off her bed and ran out of her bedroom to find her boyfriend, who was asleep in the living room. Defendant followed A.F. to the living room, where he then acted like nothing had happened and left the apartment. A.F. testified, at that point, she was unable to tell her boyfriend what had happened because she "was in shock." She then took a shower because she "felt disgusting." After the shower, she told her boyfriend what had happened. They then stayed awake together until she had to go to work that day.

¶ 12 Although A.F. went to work, she was unable to complete her work shift. She called the police. A police officer met her at the apartment, where her boyfriend was also present. She was interviewed by the police officer and then went to the hospital. Although she was scheduled to work the next day, A.F. testified she did not go because of "[f]ear, anxiety." She testified she then missed about a week and a half of work because she "just couldn't bring myself to leave out of my apartment."

¶ 13 In total, A.F. believed she drank about a pint of tequila between 8 p.m. on October 13, 2018, and the early morning hours of October 14, 2018. A.F. acknowledged she was

intoxicated but asserted she "wasn't that intoxicated," explaining she "was aware and alert to what's going on, who's in my house, all that." A.F. also testified she had prior experiences with drinking alcohol.

¶ 14     A.F. acknowledged her boyfriend had chosen not to participate in the investigation and trial in this matter. When asked if she was aware whether her boyfriend and defendant had been close friends for some time, A.F. testified, "My boyfriend said he knew him for years, he knows his mother, and supposedly they were good friends."

¶ 15                    2. *Police Officer John Franquemont*

¶ 16     Police officer John Franquemont testified, at approximately 7:15 p.m. on October 14, 2018, he responded to an apartment to investigate a possible sexual assault. A.F. and A.F.'s boyfriend were present at the apartment. Both appeared upset. Officer Franquemont spoke with A.F., who had called the police. The following inquiry occurred concerning that call:

"Q. And did you ask [A.F.] why the police had been called?

A. Yes.

Q. And what did she tell you?

A. She told me that night she, her boyfriend and her boyfriend's friend, O.J., were drinking in their apartment. She went to bed, woke up to O.J. digitally fingering her vagina.

Q. What did she tell you she did when she woke up to that?

A. She pushed him off and then went to go get her boyfriend.

Q. At that point, based on what [A.F.] had told you, did you explain to her the process of obtaining a sexual assault kit?

A. Yes."

Upon learning A.F. was willing to having a sexual assault kit administered to her, Officer Franquemont escorted A.F. to the hospital. He later retrieved a sexual assault kit which was administered to A.F. at the hospital and secured it for testing. Officer Franquemont testified A.F.'s boyfriend did not give his full name or make a statement about the incident when he was at the apartment.

¶ 17                                3. *Emergency Room Nurse Dawn Braczell*

¶ 18        Emergency room nurse Dawn Braczell testified, at approximately 8:45 p.m. on October 14, 2018, she conducted a sexual assault examination of A.F. Braczell explained she introduced herself to A.F., gave A.F. a brief explanation of what she did, and then asked "simply what happened." Braczell took notes while A.F. provided her account of what had happened. The following inquiry occurred concerning A.F.'s account to Braczell:

> "Q. Okay. I want to talk to you about what she told you happened. Did [A.F.] tell you where the assault happened?
>
> A. Yes.
>
> Q. Where did it happen?
>
> A. At home in her bedroom.
>
> Q. What had she been doing immediately before the assault?
>
> A. Sleeping.
>
> Q. Who was in the apartment with her before she went to sleep?
>
> A. It was her boyfriend and his friend.
>
> Q. Did she tell you who his friend was?
>
> A. Yes.

Q. What was the name that she gave you?

A. Octavius Jackson.

Q. What did [A.F.] tell you about the actual assault?

A. She said that she had gone to bed about 4:00 in the morning, and that she had woken up to the feeling of someone touching and playing with her vagina, and then, when she opened up, she saw shoes that were not her boyfriend's, and that's when she kind of woke up fully.

Q. And did she indicate to you who the person was that she woke up to?

A. Yes. She said that her boyfriend's friend was wearing those shoes earlier that night.

Q. And did she tell you that name again?

A. Possibly.

Q. Okay. In the paperwork, is there a place for you to put the offender's name?

A. Yes.

Q. And did you put the offender's name in the paperwork?

A. Yes.

Q. And did you put Octavius Jackson in that—

A. Yes, I did.

Q. —in that place? Did she tell you what the offender did after the assault was over?

- 6 -

> A. She said that she yelled and pushed him off of her then he
>
> left."

Braczell described A.F. as "[k]ind of closed off, very withdrawn," when giving her account of what had happened. Braczell explained, "[a]t first, she wouldn't tell me the story unless I asked questions, similar to most sexual abuse victims I've spoken to." After being provided with A.F.'s account of what had happened, Braczell, with A.F.'s consent, physically examined A.F. and administered a sexual assault kit. Braczell did not observe any injuries during an external and internal vaginal examination. Braczell collected swabs from A.F.'s vaginal area, which she then preserved and sealed for later analysis.

¶ 19                      4. *Police Detective Darrin McCartney*

¶ 20         Police detective Darrin McCartney testified he collected a sample from defendant to serve as a standard sample for deoxyribonucleic acid (DNA) comparison.

¶ 21                            5. *Dana Pitchford*

¶ 22         It was stipulated Dana Pitchford, if called to testify, would be qualified as an expert in the field of criminal forensic DNA analysis and testify about her analysis of a vaginal swab taken from A.F. Pitchford determined the level of DNA on the swab was in such a small quantity that it was unsuitable for comparison to known standards in this case belonging to A.F. and defendant.

¶ 23                           6. *Closing Arguments*

¶ 24         In closing, the State argued A.F. and her account of what had happened to her were credible. In support, the State highlighted (1) A.F.'s demeanor, (2) A.F.'s actions after the reported assault, (3) A.F.'s account was consistent, (4) the absence of any reason for A.F. to lie, and (5) the absence of evidence suggesting A.F. was so intoxicated that she did not know her surroundings.

Conversely, the defense argued it was possible that A.F. had mistaken the identity of the perpetrator. In support, the defense highlighted (1) the quantity of alcohol consumed by A.F., (2) the possible effects of drinking alcohol with an energy drink, (3) A.F.'s boyfriend was in her room before she fell asleep, (4) A.F.'s boyfriend refused to testify, and (5) the absence of physical evidence corroborating A.F.'s testimony.

¶ 25                                    7. *Jury's Deliberations and Verdict*

¶ 26            During its deliberations, the jury sent a note asking three questions: (1) "Was the victim compelled by the [S]tate to continue the prosecution?"; (2) "Was she allowed to drop the case?"; and (3) "Why was the boyfriend not subpoenaed?" By agreement of the parties, the trial court instructed the jury as follows: "You have before you all of the evidence in this case. You must base your decision on the evidence presented and the court's instructions." Following further deliberations, the jury returned a verdict finding defendant guilty of criminal sexual assault.

¶ 27                                    C. Posttrial Proceedings

¶ 28            In October 2019, defendant filed a motion for judgment notwithstanding the verdict or, alternatively, a new trial, raising various claims unrelated to the issues raised in this appeal. At a hearing later that month, the trial court denied defendant's motion and then proceeded to sentencing.

¶ 29            The court received a presentence investigation report (PSI) for its consideration. According to the PSI, defendant, who was 40 years old at the time, had a criminal history which included, in addition to several traffic and ordinance violations, a 1999 felony conviction for the manufacture and delivery of a controlled substance and a 2005 felony conviction for unlawful possession of a controlled substance. For his 1999 conviction, defendant was sentenced to four years' imprisonment. For his 2005 conviction, defendant was sentenced to 24 months'

imprisonment. Defendant had not had any involvement with the criminal justice system since 2011 and had been gainfully employed for several years. Defendant reported being a high school graduate, having positive familial relationships, and having no children. Defendant also reported consuming a minimum of a 12-pack of beer daily for the past 10 years and last consuming alcohol during the summer of 2018. After being charged in this case, defendant was released on bond with the condition that he participate in an electronic monitoring program. The trial court later, after hearing evidence of defendant's failure to recharge his electronic monitoring device and providing an address where he did not live, increased the amount of defendant's bond, which resulted in defendant's incarceration.

¶ 30 The State recommended defendant be sentenced to eight years in prison. In support, the State highlighted (1) defendant's criminal history, (2) A.F.'s testimony at trial detailing the impact of the assault, (3) defendant's failure to comply with the conditions of his bond, and (4) defendant's failure to be truthful with the presentence investigator as evidenced by his report that he had not consumed alcohol since summer 2018 even though the testimony at trial indicated he was consuming alcohol in October 2018. Conversely, the defense recommended defendant be sentenced to a term of imprisonment "in the lower end of the sentencing range." In support, the defense highlighted defendant's age, rehabilitative potential, and impact on defendant's family. Following the recommendations, defendant made a statement in allocution, requesting leniency.

¶ 31 Based upon its consideration of the information contained in the PSI, the recommendations, the statement in allocution, and the statutory factors in aggravation and in mitigation, the trial court sentenced defendant to eight years in prison. In the oral pronouncement of its decision, the court specifically stated:

"Well, I've considered the report prepared by court services.

I've considered the comments of counsel, as well as the comments of the defendant. I've considered the statutory factors in aggravation, as well as the statutory factors in mitigation.

In looking at the defendant's history, there aren't any statutory mitigating factors that apply to this defendant to this type of an offense.

There is mitigation in this record. He has gotten his high school diploma. He has been able to obtain and maintain employment. And we're not talking about fast food restaurants or anything like that. We're talking about substantial employment. These are all nonstatutory mitigating factors.

The two statutory factors in aggravation, he has the prior criminal history which is set forth in the presentence report. He was convicted of manufacture, delivery of a controlled substance in '99 out of Winnebago County and was, was sentenced to four years in the department of corrections. And then in '05 he was convicted of unlawful possession of a controlled substance out of Champaign County and sentenced to 24 months in the department of corrections. So the prior criminal history, two drug cases. He has some OV violations, which the court does not consider as a statutory factor in aggravation.

The other statutory factor in aggravation is the deterrent factor. The court has to fashion a sentence that will not only deter

this defendant, but other individuals similarly situated from committing this type of an offense. Criminal sexual assault is a deterrable offense and the sentence imposed today will not only act as a deterrent for the defendant, but hopefully for other individuals similarly situated.

One other mitigating factor, this defendant has not brought any children into this world that he's not prepared to support and/or raise and, again, the court considers that as a mitigating factor.

The court recalls the testimony at trial. Criminal sexual assault cases are difficult cases for all concerned. In this case, the difficulty was alleviated because I had two lawyers that tried a very, very good case, and the court is always thankful when that happens, but what we had was a lot of alcohol being consumed by a lot of—by the—basically the three people who were in the apartment at the time of the offense. That would be the victim, that would be the defendant and one can assume the absent boyfriend. Alcohol obviously contributed to this offense. It doesn't rise to a—to a defense but, nonetheless, it's a factor that [this] court has to consider.

The range is somewhere between four and fifteen years. I believe counsel's assessment that the maximum isn't required, something more than the minimum is required, if only because of the defendant's prior criminal history. Therefore, I believe an

appropriate sentence will be one of incarceration to the Illinois Department of Corrections. It will be for a period of eight years. He will get credit for 276 days served in the Champaign County Correctional Center. Period of mandatory supervised release of three years to natural life. It may also be a two-year period of mandatory supervised release, but I will admonish him and sentence him to the maximum allowed for mandatory supervised release."

¶ 32    Defendant, after being admonished of the need to file a motion to reconsider his sentence to preserve any sentencing issues for review, elected to file a notice of appeal without filing any postsentencing motion.

¶ 33    This appeal followed.

¶ 34                                   II. ANALYSIS

¶ 35    On appeal, defendant complains about (1) the State's purported elicitation and use of multiple inadmissible hearsay statements of A.F. to bolster A.F.'s credibility and (2) the trial court's purported imposition of an excessive sentence. Defendant acknowledges his failure to raise these issues below results in their forfeiture for purposes of appeal but requests the issues be reviewed under the plain-error doctrine and as a matter of ineffective assistance of counsel.

¶ 36    The plain-error doctrine provides a "narrow and limited exception" to the general rule of forfeiture. *People v. Reese*, 2017 IL 120011, ¶ 72, 102 N.E.3d 126. Under the plain-error doctrine, a reviewing court may disregard a defendant's forfeiture and consider an unpreserved claim of error in two circumstances:

> "(1) where a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of

justice against the defendant, regardless of the seriousness of the

error and (2) where a clear or obvious error occurred and that error

is so serious that it affected the fairness of the defendant's trial and

challenged the integrity of the judicial process, regardless of the

closeness of the evidence." (Internal quotation marks

omitted.) *People v. Harvey*, 2018 IL 122325, ¶ 15, 115 N.E.3d 172.

The defendant bears the burden of persuasion in establishing plain error. *People v. Wilmington*, 2013 IL 112938, ¶ 43, 983 N.E.2d 1015.

¶ 37          Forfeited issues may also be addressed as a matter of ineffective assistance of counsel. To prevail on a claim of ineffective assistance of counsel, it must be shown both (1) counsel's performance was objectively unreasonable under prevailing professional norms and (2) there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *People v. Simpson*, 2015 IL 116512, ¶ 35, 25 N.E.3d 601. The defendant bears the burden of persuasion of establishing ineffective assistance. *Id.*

¶ 38          First, defendant argues plain error occurred or his trial counsel provided ineffective assistance by failing to object, when the State elicited multiple inadmissible hearsay statements of A.F. and then used those statements to bolster A.F.'s credibility. Specifically, defendant contends A.F.'s hearsay statements, elicited through the testimony of Officer Franquemont and Nurse Braczell, were prior consistent statements improperly used to bolster A.F.'s credibility.

¶ 39          In this case, we find it unnecessary to consider whether the State's elicitation of A.F.'s statements through the testimony of Officer Franquemont and Nurse Braczell and then use of those statements in its closing argument amounted to error because it is clear defendant has not shown either (1) the evidence was so closely balanced that the alleged error threatened to tip the

- 13 -

scales of justice against him or (2) the alleged error is so serious that it affected the fairness of his trial and challenged the integrity of the judicial process. See *People v. Scott*, 2015 IL App (4th) 130222, ¶ 32, 25 N.E.3d 1257 (finding it unnecessary to consider whether any error occurred where the evidence was not closely balanced). Similarly, we find it unnecessary to consider whether trial counsel's failure to object amounted to constitutionally deficient performance because it is clear defendant has not shown that there is a reasonable probability the result of the proceeding would have been different had counsel objected. See *People v. Hale*, 2013 IL 113140, ¶ 17, 996 N.E.2d 607 (acknowledging a court "may dispose of an ineffective assistance of counsel claim by proceeding directly to the prejudice prong without addressing counsel's performance").

¶ 40        We initially reject defendant's suggestion that the alleged improper elicitation and use of prior consistent statements to bolster a witness's credibility is an error so serious that it affects the fairness of a defendant's trial and challenges the integrity of the judicial process. Setting aside the fact defendant provided no authority supporting his position in his initial brief, the authority he cites in his reply brief comes from appellate court cases which predate a supreme court case cited by the State, *People v. Keene*, 169 Ill. 2d 1, 18, 660 N.E.2d 901, 910 (1995), which specifically found a prior consistent statement used improperly to bolster a witness's credibility does not implicate a substantial right for purposes of review under the second prong of the plain-error doctrine. Absent any argument suggesting *Keene* is inapplicable, we are bound by the supreme court's decision. Defendant has not shown second-prong plain error.

¶ 41        We further reject defendant's suggestion that (1) the alleged improper elicitation and use of prior consistent statements to bolster A.F.'s credibility threatened to tip the scales of justice against him because the evidence was so closely balanced and (2) there is a reasonable probability the result of the proceeding would have been different had his trial counsel objected.

At trial, the issue in dispute concerned A.F.'s identification of the perpetrator. A.F. testified and identified defendant as the perpetrator. In an attempt to discount that identification, defendant inquired about A.F.'s intoxication at the time of the assault. Defendant's inquiry, however, fell short. A.F. explained, despite being intoxicated, she "was aware and alert to what's going on, who's in my house, all that." In fact, A.F. explained how she could identify defendant not only by his face but also by the specific clothing and shoes he was wearing. Defendant, on appeal, further cites the jury's note in support of his claims. The jury's note, however, does not garner defendant any support as it invites mere speculation as to the jury's intentions for their questions. Ultimately, A.F. made a positive, unimpeached identification of defendant as the perpetrator, and we are unconvinced the introduction and use of any prior consistent statements of A.F. had any meaningful effect on that identification or the outcome of the trial. Defendant has not shown first-prong plain error or ineffective assistance of counsel.

¶ 42 Second, defendant argues plain error occurred or his trial counsel provided ineffective assistance by failing to object, when the trial court imposed an excessive sentence against him. Specifically, defendant contends his sentence is excessive in light of his employment and familial support as well as the fact his two prior felony offenses occurred during his youth.

¶ 43 A sentence that falls within the applicable statutory limits is generally reviewed for an abuse of discretion. *People v. Price*, 2011 IL App (4th) 100311, ¶ 36, 958 N.E.2d 341. This is because a trial court is generally "in a better position than a court of review to determine an appropriate sentence based upon the particular facts and circumstances of each individual case." (Internal quotation marks omitted.) *Id.* "A sentence within statutory limits will not be deemed excessive and an abuse of the court's discretion unless it is 'greatly at variance with the spirit and purpose of the law or manifestly disproportionate to the nature of the offense.' " *People*

*v. Pina*, 2019 IL App (4th) 170614, ¶ 20, 143 N.E.3d 794 (quoting *People v. Fern*, 189 Ill. 2d 48, 54, 723 N.E.2d 207, 210 (1999)).

¶ 44        In this case, it is undisputed defendant's 8-year prison sentence falls within the applicable statutory sentencing range of 4 to 15 years. See 720 ILCS 5/11-1.20(b)(1) (West 2018); 730 ILCS 5/5-4.5-30(a) (West 2018). It is also undisputed the trial court, in reaching its sentencing decision, considered the information contained in the PSI, the recommendations, the statement in allocution, and the statutory factors in aggravation and in mitigation. Upon reviewing the record, we cannot say defendant's sentence is greatly at variance with the spirit and purpose of the law or manifestly disproportionate to the nature of the offense and, therefore, reject his claim that his sentence is excessive. Absent any error, defendant has not shown plain error or ineffective assistance of counsel.

¶ 45                          III. CONCLUSION

¶ 46        We affirm the trial court's judgment.

¶ 47        Affirmed.