NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2023 IL App (4th) 220713-U

NO. 4-22-0713

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
April 26, 2023
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Ogle County |
| LYLE BUSHLAND, | ) | No. 22CF67 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | John Benjamin Roe IV, |
| | ) | Judge Presiding. |

JUSTICE HARRIS delivered the judgment of the court.
Justices Steigmann and Doherty concurred in the judgment.

**ORDER**

¶ 1     *Held*: Defendant failed to establish he was denied his constitutional right to the effective assistance of counsel at his jury trial.

¶ 2     A jury found defendant, Lyle Bushland, guilty of aggravated battery on public property, and the trial court sentenced him to 180 days in jail and 30 months' probation. Defendant appeals, arguing he was denied his right to the effective assistance of counsel. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4     On March 22, 2022, the State charged defendant with aggravated battery on public property (720 ILCS 5/12-3.05(c) (West 2020)). The State alleged that on March 20, 2022, defendant "made physical contact of an insulting or provoking nature with Barry Brown" by

tackling Brown in the Ogle County jail. In May 2022, defendant filed notice of his intent to raise self-defense as an affirmative defense to the charged offense.

¶ 5        Defendant's jury trial commenced and concluded on May 17, 2022. On the day of trial, the State filed a motion *in limine* seeking to use defense witness John Simmons's convictions for possession of another person's credit card in Ogle County case No. 19-CF-204 and domestic battery in Ogle County case No. 21-CF-186 for impeachment purposes. The trial court granted the motion over defendant's objection.

¶ 6        The State called, as its first witness, Denielle Merkle, an Ogle County corrections officer. Merkle testified she was assigned to investigate a physical altercation that occurred between defendant and another inmate, Barry Brown, on March 20, 2022. As part of her investigation, Merkle reviewed a video recording of the incident. Merkle testified there were no issues with the jail's recording system and the video "fairly incorporate[d] all of" the incident, although she acknowledged on cross-examination that she did not personally witness the altercation.

¶ 7        Brown testified he was in custody at the Ogle County jail on the evening of March 20, 2022, and was housed in the same cell block as defendant. Brown described the cell block as consisting of "about eight or nine sets of double cells" and an adjacent common area with two rows of chairs facing a TV mounted on the wall. At around 9:50 p.m., Brown was walking back and forth along the back wall of the common area for exercise while several other inmates, including defendant, were watching a basketball game. Brown testified defendant was watching TV for awhile and then got up and walked away, leaving the TV remote on a chair. While defendant was gone, Brown changed the channel to a different basketball game. When defendant returned, he told Brown he thought he had had the high-definition channel on the TV.

Brown informed him that he was not changing it to the high-definition channel but to a different game entirely. Defendant did not understand what Brown was telling him and was "getting more agitated," but Brown did not know how else to explain it so he returned to walking back and forth along the back wall. Brown testified that as he was walking, defendant said to him, "why don't you just start swinging." Brown responded by telling defendant "he was being ridiculous" and he "had no reason to fight him." Around this time, defendant "jumped up out of his seat, circled around and charged [Brown] and tackled [him]." Brown testified he never threatened defendant but instead was "trying to defuse the situation verbally." On cross-examination, Brown acknowledged he and defendant "were yapping back and forth, but—it wasn't a pleasant conversation."

¶ 8        During Brown's testimony, a video recording of the incident was admitted into evidence and published to the jury. In the video, which does not contain audio, defendant can be seen sitting in the back row of seats watching TV while Brown is walking along the back wall with his hands holding his shirt collar. As Brown approaches the seating area, defendant stands up out of his seat, circles around the chairs, and walks quickly towards Brown. Brown takes several steps backwards as defendant is approaching him. Defendant then lunges at Brown and puts his arms around him while Brown puts his arms around defendant's head. Both parties fall to the floor almost immediately upon making contact with one another. Defendant and Brown then wrestle for over a minute until they separate and defendant leaves the common area.

¶ 9        Samuel Gendusa, a patrol deputy with the Ogle County Sheriff's Office, testified that on March 22, 2022, he was assigned to investigate the incident between defendant and Brown. As part of the investigation, Deputy Gendusa interviewed defendant at the Ogle County jail. The interview was audio-recorded, and the recording was admitted into evidence and

portions of it were published to the jury. In the interview, Deputy Gendusa asked for defendant's version of what transpired, and defendant responded by saying that he could no longer stand Brown insulting him and his family so he "took care of it." At one point in the interview, Deputy Gendusa explicitly asked defendant whether Brown had ever threatened to come after him or hit him, to which defendant stated only that Brown's clothing and posture indicated to him that Brown wanted defendant "to bring it." Defendant indicated that he told Brown to "stop fucking talking and start swinging," but Brown "didn't want to swing but he wanted to keep aggravating *** and walking back and forth." Defendant explained that he charged at Brown because he had "had enough" of Brown's insults and could not allow Brown to make him "look like a pussy."

¶ 10    Defendant called John Simmons to testify. Simmons testified he was in custody at the Ogle County jail on the evening of March 20, 2022, and witnessed the altercation between defendant and Brown. Simmons testified he was "maybe" related to defendant "by marriage somewhere down the line" but did not have an "ongoing significant relationship with him." According to Simmons, while defendant was watching TV, Brown was "[c]ussing at [defendant], and swearing and telling him his wife has been sleeping with somebody" and "he don't even know if his kids are his." Simmons testified Brown repeatedly told defendant "to get up, bitch" and "to stand the F up." Simmons further testified that defendant stood up when Brown began walking towards him. Simmons explained that defendant and Brown "basically met each other and they both grabbed each other and fell down." During his testimony, Simmons acknowledged having been convicted of possession of another person's credit card and domestic battery.

¶ 11    Following Simmons's testimony, and outside of the presence of the jury, defense counsel moved to admit into evidence certified copies of Brown's recent convictions for

domestic battery, violation of bail bond, and resisting a peace officer. The State did not object, stating as follows:

"MR LEISTEN [(ASSISTANT STATE'S ATTORNEY)]: Judge, no objection, I believe the purpose is for self-defense purposes, so we would stipulate and not object to the convictions he received that were filed, in the nature of, like a domestic battery, we understand it's relevant for self-defense. We don't believe it's relevant though to impeach his credibility, like a domestic battery is not a crime of dishonesty, for instance."

The trial court granted the motion, and the certified copies of the convictions were admitted into evidence. During the instruction conference, defense counsel agreed to submit Illinois Pattern Jury Instructions, Criminal, No. 3.12 (approved Oct. 17, 2014), which provides, "Evidence that a witness has been adjudicated of an offense may be considered by you only as it may affect the believability of the witness."

¶ 12        During closing arguments, the prosecutor stated, in relevant part:

"MR. LEISTEN: We submit that Barry Brown was a very credible witness. His testimony was corroborated by the videos, the photos, his whole truthfulness about what happened. He had nothing to hide.

We submit that John Simmons was not a believable witness. His testimony was not corroborated by the video, we submit. You can also take into consideration John Simmons's prior convictions against his credibility. We don't believe he was a credible witness."

¶ 13 Following deliberations, the jury found defendant guilty of the charged offense beyond a reasonable doubt. On July 14, 2022, the trial court sentenced defendant to 180 days in jail and 30 months of probation.

¶ 14 This appeal followed.

¶ 15 II. ANALYSIS

¶ 16 On appeal, defendant argues he was deprived of his constitutional right to the effective assistance of counsel at his jury trial. Specifically, defendant argues trial counsel performed deficiently by failing to (1) explain to the jury how it could use Brown's prior convictions, (2) prevent the State from using Simmons's prior conviction for domestic battery as impeachment evidence, and (3) object to the prosecutor's statements during closing arguments vouching for the credibility of Brown and expressing a personal opinion on Simmons's lack of credibility. Defendant further contends he was prejudiced by counsel's deficient performance because it "directly impacted the jurors' attempt to sift through competing, yet plausible, accounts of what occurred between [him] and Brown, and thereby interfered with their ability to resolve the witnesses' credibility and the merits of their respective testimony in a very close case." We review ineffective-assistance claims *de novo*. *People v. Hibbler*, 2019 IL App (4th) 160897, ¶ 88.

¶ 17 The United States and Illinois Constitutions provide criminal defendants with the right to the effective assistance of counsel. See U.S. Const., amends. VI, XIV; Ill. Const. 1970, art. I, § 8. Claims of ineffective assistance of counsel are analyzed under the two-pronged standard set forth in *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984). "To prevail on an ineffective assistance of counsel claim, a defendant must show that (1) counsel's performance fell below an objective standard of reasonableness and (2) counsel's deficient performance

- 6 -

resulted in prejudice." *People v. Lewis*, 2022 IL 126705, ¶ 44. Stated differently, "a defendant must show that counsel's performance was objectively unreasonable under prevailing professional norms and that there is a 'reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' " *People v. Domagala*, 2013 IL 113688, ¶ 36 (quoting *Strickland*, 466 U.S. at 694). "A 'reasonable probability' is defined as 'a probability sufficient to undermine confidence in the outcome.' " *People v. Simpson*, 2015 IL 116512, ¶ 35 (quoting *Strickland*, 466 U.S. at 694). "A defendant must satisfy both prongs of the *Strickland* test and a failure to satisfy any one of the prongs precludes a finding of ineffectiveness." *Id.*

¶ 18        "Self-defense is an affirmative defense, and once a defendant raises it, the State has the burden of proving beyond a reasonable doubt that the defendant did not act in self-defense." *People v. Lee*, 213 Ill. 2d 218, 224 (2004).

> "The elements of self-defense are: (1) that unlawful force was threatened against a person; (2) that the person threatened was not the aggressor; (3) that the danger of harm was imminent; (4) that the use of force was necessary; (5) that the person threatened actually and subjectively believed a danger existed that required the use of the force applied; and (6) the beliefs of the person threatened were objectively reasonable." *Id.* at 225.

"If the State negates any one of these elements, the defendant's claim of self-defense must fail." *Id.*

¶ 19        Here, even assuming, *arguendo*, defendant can demonstrate counsel performed deficiently, he is unable to prove prejudice, as the State's evidence negates his self-defense claim. According to defendant, "Brown's conduct in approaching [him] from behind while

telling him to 'stand the F up' and 'to get up, bitch' while also insulting him and his family could reasonably be perceived as a threat to his safety." We disagree. The video recording and defendant's statements to Deputy Gendusa undermine any assertion that defendant was in imminent danger of harm, that the use of force was necessary, or that defendant believed a danger existed that required the use of force.

¶ 20        In the video, Brown can be seen walking along the back wall of the common area—something Brown testified to doing regularly for exercise—while defendant is seated in the back row of seats watching TV. At no point does Brown come within an arm's length of defendant, let alone attempt to make any physical contact with him. In fact, when defendant stands up and charges at Brown, Brown appears surprised, keeps his hands on his shirt collar, and even takes several steps backwards. Moreover, during his interview with Deputy Gendusa, defendant admitted that he did not actually believe an imminent danger of harm existed. When explicitly asked whether Brown had threatened to hit him, defendant said only that Brown's clothing and posture indicated to him that Brown wanted him "to bring it." According to defendant, he told Brown to "stop fucking talking and start swinging," but Brown "didn't want to swing but he wanted to keep aggravating *** and walking back and forth." Defendant explained that he had "had enough" of Brown's insults and could not allow Brown to make him "look like a pussy" by just sitting there while being insulted. In other words, defendant himself acknowledged that he did not believe an imminent danger of harm existed by saying he knew Brown "didn't want to swing" but only wanted to continue insulting him. At most, the evidence shows Brown repeatedly insulted defendant and challenged him to a fight and defendant accepted his invitation. However, as the State notes in its brief, a self-defense claim is unavailable where, as here, the parties fight willingly upon equal terms. See *People v. White*, 293

- 8 -

Ill. App. 3d 335, 338 (1997) ("This case appears to be a mutual combat situation, where both parties fought willingly upon equal terms. The perfect defense of self-defense is not available in such a situation."). Accordingly, we find there is not a reasonable probability the jury would have accepted defendant's self-defense claim but for counsel's allegedly deficient performance.

¶ 21                                III. CONCLUSION

¶ 22         For the reasons stated, we affirm the trial court's judgment.

¶ 23         Affirmed.