NO. 4-08-0027

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

THE PEOPLE OF THE STATE OF ILLINOIS,   )   Appeal from
      Plaintiff-Appellee,                )   Circuit Court of
      v.                                 )   Champaign County
VERNON J. FONNER,                       )   No. 06DT799
      Defendant-Appellant.               )
                                        )   Honorable
                                        )   Richard P. Klaus,
                                        )   Judge Presiding.
_____

MODIFIED UPON DENIAL OF REHEARING

JUSTICE TURNER delivered the opinion of the court:

In November 2006, defendant, Vernon J. Fonner, was arrested for and charged by citation with driving under the influence (DUI) (625 ILCS 5/11-501(a)(2) (West 2006) (as amended by Pub. Acts 94-329, §5, eff. January 1, 2006 (2005 Ill. Legis. Serv. 2181, 2181 (West)), and 94-963, §5, eff. June 28, 2006 (2006 Ill. Legis. Serv. 2172, 2199-2200 (West)))). After he was taken to jail, defendant refused to submit to a Breathalyzer test. In December 2006, the Secretary of State's office sent defendant a notice, indicating the summary suspension of defendant's driving privileges for three years, effective January 4, 2007. That same month, defendant filed a petition to rescind the statutory summary suspension. After a hearing, the trial court denied defendant's petition in December 2007.

Defendant appeals pro se, contending the trial court

erred by denying his petition to rescind his statutory summary suspension because (1) the arresting officer lacked reasonable grounds to believe defendant was driving or in actual physical control of his motor vehicle on the morning in question and (2) defendant did not refuse chemical testing.  We affirm.

I. BACKGROUND

The November 19, 2006, DUI citation stated defendant unlawfully operated a 1995 Green Cadillac Eldorado on Country Fair Road and Springfield Avenue in Champaign, Illinois.  Police officer Eric Hart issued the citation and, after defendant refused the breath test, prepared a sworn report indicating defendant's refusal to submit to a chemical test as required by section 11-501.1(d) of the Illinois Vehicle Code (625 ILCS 5/11-501.1(d) (West 2006)).  In December 2006, the Secretary of State's office notified defendant of his three-year summary suspension.

On December 29, 2006, defendant filed a petition to rescind his statutory summary suspension based on the following grounds:  (1) the arresting officer did not have reasonable grounds to believe he was driving or in actual physical control of a motor vehicle, (2) he was not properly warned by the arresting officer as required by section 11-501.1(c) of the Illinois Vehicle Code (625 ILCS 5/11-501.1(c) (West 2006)), and (3) he did not refuse to submit to and/or complete the required chemical

test requested by the arresting officer.

On May 11, 2007, the State made a motion to dismiss the DUI charge in the criminal matter, which the trial court granted. The court also commenced the hearing on defendant's petition to rescind. Defendant testified on his own behalf and presented the testimony of Rick Boley, defendant's friend; and Vernon Bruce Fonner, defendant's father. The State presented the testimony of Officer Hart and Officer Christina Benton.

Officer Hart testified that, in the early morning hours of November 19, 2006, he was on patrol with Officer Benton, who was his field training officer. At approximately 2:58 a.m., he was driving eastbound on Springfield Avenue and approached the stoplight at the intersection of Springfield Avenue and Country Fair Road. Officer Hart turned right onto southbound Country Fair Road to follow a dark green Cadillac that had proceeded through the intersection without an operable rear registration light, which is a violation of the Illinois Vehicle Code (see 625 ILCS 5/12-201(c) (West 2006)). The vehicle stopped halfway down the block across from D.R. Diggers, a bar. When the vehicle pulled over to stop, it did not use its right turn signal. Officer Hart drove past the vehicle, went down the rest of the block, and made a U-turn.

When he first passed the vehicle heading southbound, he only observed one occupant. Officer Hart acknowledged he had

told defense counsel he did not know whether the vehicle had one or two occupants but at that time he had not reviewed his reports. The squad car's headlights were sufficient to illuminate the Cadillac as he drove by it. Further, as he drove by the vehicle, Officer Benton pointed out she knew defendant. Officer Hart then drove back and parked on the north side of D.R. Diggers. Officer Hart did not lose sight of the vehicle from the time he first observed it until he made the U-turn. After the turn, he observed defendant, who was wearing an unusual hat, walking across Country Fair. However, Officer Hart did not see defendant drive or exit the vehicle. Additionally, Officer Hart acknowledged he could have pulled up behind the Cadillac, approached the vehicle, and pointed out the violations to the driver.

After he parked the squad car, Officer Hart headed to D.R. Diggers because his reasons for turning around were (1) to investigate whether D.R. Diggers was serving alcohol after 2 a.m. and (2) to find the location of the driver of the Cadillac. As he was approached the bar, Officer Benton informed him of defendant's location. When he and Officer Benton approached defendant, defendant was talking on a cellular telephone. When defendant saw the officers, he threw his keys behind him and stated he was not driving a vehicle. Defendant repeatedly stated he was not driving a vehicle and was trying to call a cab.

- 4 -

Officer Hart did not know to whom defendant was talking on the cellular telephone. No sobriety tests were performed on defendant because he would not allow them. Based on his prior law-enforcement experience, Officer Hart noted defendant appeared in "an extreme and obvious manner" to be impaired by something. Officer Benton made the decision to arrest defendant for DUI, and Officer Hart put him in custody. While en route to the jail, defendant continued to state he was not driving the vehicle. Defendant indicated a friend was driving his vehicle, dropped defendant off, left the vehicle, and headed southbound. Officer Hart did not make any effort to determine the friend's identity because Officer Benton had seen defendant driving. Officer Hart was unaware of Officer Benton's history with defendant's family. Further, Officer Hart did not believe defendant's statement he was not driving due to the manner in which defendant reacted to seeing the officers and the fact he did not see anyone else around the area besides defendant.

Officer Hart further testified he was probably in the squad car when he read verbatim to defendant the warning-to-motorist form. The form indicated Officer Hart read the warning at 3:36 a.m., and Officer Hart indicated that time was accurate. Later, either he or Officer Benton asked defendant to submit to a breath test, and defendant replied, "f--k no." Officer Hart did not recall what time the request was made. Officer Hart also

explained a 20-minute observation period must take place before the breath test can be administered, and if the person being observed regurgitates or vomits, the person must be allowed to rinse his or her oral cavity and the 20-minute period starts anew. Officer Hart was not present during the entire observation period but did recall defendant belching and making noises. Officer Hart did not personally offer to let defendant rinse out his mouth.

Officer Hart also testified that, on November 19, 2006, he was in his probationary period with the Champaign city police department and had two years of prior experience with Zion city police department. Officer Hart received criticism of his job performance during the probationary period and ended up leaving the Champaign police department in December 2006. While he did not have a lot of experience with DUIs, DUI enforcement was not one of his noted deficiencies.

Boley testified he was a 51-year-old maintenance worker for Barr Real Estate and had met defendant almost 10 years earlier through defendant's father. He and defendant had a social relationship in which they would play cards and pool. Boley had started the night at D.R. Diggers and had four beers there. Boley felt he could not drive due to the amount of alcohol he had consumed and got a ride to Chief's bar, where he arrived at around 11 p.m. Between 12 and 12:30 a.m., Boley saw

defendant at Chief's.  When they were able to get a table, he and defendant played pool together.  Boley observed defendant drinking both beer and hard liquor.  They stayed at Chief's until after "last call."  Before leaving, they talked about maybe going and playing some poker or something.  Defendant indicated he had too much to drink and could not drive.  Boyle stated he could drive them over to D.R. Diggers, drop off defendant's car, and then go out in his truck.

Defendant gave Boyle the keys to his vehicle.  Boyle is 6 feet 3 inches tall and considerably taller than defendant.  Boyle had to move the driver's seat of defendant car back to get into it.  Defendant sat in the passenger seat.  Boyle could not recall how defendant was sitting in the seat.  In returning to D.R. Diggers, Boyle headed southbound on Country Fair Road and passed through the intersection with Springfield Avenue.  He did not notice any police vehicles on Springfield Avenue at the intersection.  A bank was located at the intersection, and Boyle observed the bank sign displayed a time of 2:39 a.m.  Defendant asked Boyle to park on the west side of the road across from D.R. Diggers because defendant was concerned about his car being towed.  After parking the car, Boyle got out of the car and walked across the street toward his truck, and defendant followed.  Boyle did not see any police vehicles as he crossed the street.

Once they were both inside Boyle's truck, Boyle gave defendant the keys to defendant's vehicle. Defendant made several telephone calls looking for a card game but could not come up with anything. Boyle decided to go home, and defendant exited Boyle's truck. Boyle saw defendant walking away from the truck with a cellular telephone on his ear. Boyle lived about 10 minutes from D.R. Diggers, and it was a few minutes after 3 a.m. when he got home. Boyle did not know what defendant did after Boyle left D.R. Diggers' parking lot.

Defendant's father testified he was familiar with Officer Benton. In October 2005, defendant's father had a confrontation with her in the emergency room where defendant was being treated. Officer Benton wanted to question defendant, and defendant's father had refused her request. She was authoritative and direct. The conversation got heated. Defendant's father did not like the way she was asking him to do things. Defendant's father was aware of other interactions between defendant and Officer Benton based on what defendant had told him.

Defendant's father further testified he received a call from defendant at 3:03 a.m. on November 19, 2006. Defendant indicated he was in the parking lot of D.R. Diggers and was having a problem with the police. Defendant's father could hear Officer Benton's voice in the background. Defendant's father

- 8 -

told defendant he would come to the parking lot. The telephone call lasted around three minutes. Defendant's father arrived at D.R. Diggers about five minutes after the end of the call but did not see defendant. He did observe the vehicle defendant usually drove parked on the west side of Country Fair.

Defendant's father received another call from defendant at 3:38 a.m. Defendant indicated he was in the county jail. Defendant's father could hear other voices but did not hear the warning to motorists being read. The call ended at about 3:46 a.m. with the telephone just hanging up. Defendant's father picked up defendant from jail at around 5 a.m., and defendant had paperwork with him. However, defendant did not have a copy of the warning to motorists. Defendant's father further testified that, a couple of months after November 19, 2006, he checked defendant's vehicle's rear registration light and found it was working properly. He did not repair the light and did not know of anyone else replacing the light. Moreover, defendant's father did not get into the vehicle at the towing company when he and defendant went to pick up the car.

Defendant testified he was drinking beer, wine, and shots of tequila on the night in question and had a lot to drink. His testimony regarding the time he spent with Boyle that night was similar to Boyle's. Defendant also testified he liked to ride with the seat up close and reclined. According to defen-

dant, he was not observable from outside of the vehicle that morning. Like Boyle, defendant did not observe any police vehicles at the intersection of Springfield Avenue and Country Fair Road. Defendant also testified he exited his car 30 seconds to a minute after Boyle left the vehicle. When he was standing in front of his vehicle, he observed the back of a police vehicle heading southbound on Country Fair Road. Defendant crossed the street and went to Boyle's truck, which was more than half of a football field away.

After he exited Boyle's truck, defendant started to make some telephone calls looking for an after-hours party. At 2:57 and 2:59 a.m., defendant made calls to directory assistance to get telephone numbers for cab companies. He stated he could not have been at the intersection as Officer Hart testified because he was sitting in D.R. Diggers' parking lot, making the telephone calls. When defendant was placing the call to his father at 3:03 a.m., Officers Benton and Hart approached him and said, "hey." Defendant recognized Officer Benton, and as soon as she saw him, her demeanor was aggressive. Before the officers arrived, defendant had been swinging his car keys around his finger and talking on his cellular telephone. When Officer Benton said "hey," the keys slid off his finger and landed next to his shoes. He told Officer Benton he was not driving because he assumed the officers were checking on people to see who was

intoxicated. Defendant testified it was Officer Benton who arrested him.

According to defendant, the officers did not take his cellular telephone away until he reached the Breathalyzer room at the jail. Before he was taken into the Breathalyzer room, he called his father at 3:38 a.m. to let him know what was taking place. He talked to his father for eight minutes and neither Officer Hart nor Officer Benton was present during the conversation. When the call ended at 3:46 a.m., both officers had returned and immediately took defendant to the Breathalyzer room. Defendant stated neither officer read the warning to motorists to him. He also testified that, while he was in the Breathalyzer room, he was burping and belching, which brought "stuff" back up into his mouth. The belching lasted for about three to four minutes, which left a strong taste of alcohol in his mouth. The officers asked him to stop belching because it was disgusting. Defendant also indicated he was aware of the 20-minute observation period and knew 20 minutes had not passed when Officer Benton asked him to submit to a Breathalyzer test. He was also aware the absence of regurgitation in his mouth was required for a valid breath test. Defendant stated he refused to submit to the breath test because he was not driving. He also believed Officer Benton was trying to obtain a false result because she did not like him.

After his arrest, defendant's vehicle was towed to a towing company. Defendant and his father later went to the towing company to pick up the vehicle. Defendant got into the driver's side of the vehicle and had to move the seat up so he could reach the pedals. Defendant is 5 feet 10 or 11 inches tall. Moreover, subsequent to his arrest, defendant checked the rear registration light and found it operable.

Defendant also testified about his prior contacts with Officer Benton. In October 2004 or 2005, he was in the emergency room because he had been assaulted. Despite being the victim, defendant did not want to talk to Officer Benton before talking to a lawyer. He testified Officer Benton was pretty mad and frustrated she could not talk with defendant. His next encounter was four to five months later at Bar Fly. A bar fight had broken out, and one of the bartenders had been assaulted. Officer Benton got mad at defendant and accused him of being involved in the incident. Defendant asked if he could wash blood off himself, and she said he could. After he cleaned himself, he took a cab home because he believed Officer Benton said he could leave. However, she had blocked his car off with a squad car and a few days later confronted him about leaving Bar Fly by putting him up against her car and yelling at him. He also indicated she handcuffed him but never arrested him. In August 2006, defendant was in line at Soma's when Officer Benton pointed him out to

- 12 -

another officer.  The other officer pulled defendant out of line and started asking him questions about a sexual assault, of which defendant had no knowledge.  Defendant described Officer Benton's attitude toward him over the past 2 1/2 years as "[h]orrible." Defendant was not surprised Officer Benton could recognize his car because it was a unique two-door Cadillac coupe and the dark green paint had gold speckles in it.

Defendant submitted a copy of his cellular-telephone bill that showed the calls he placed on November 19, 2006.  The trial court admitted the document into evidence without objection.

Officer Benton testified she had been a police officer for around 8 1/2 years, with the last five being in Champaign. She is a certified breath-test operator and had been involved in more than 25 DUI arrests.  She first had contact with defendant when he was the victim of a battery that occurred on her beat. She took his information and photographs of his injuries.  Both of defendant's parents were present, and his father gave her some information about the incident.  She also had some other noncriminal contacts with defendant at bar closings on her beat.  He was listed as a suspect in a sexual-assault report she took, but she denied physically pointing out defendant to another officer. Officer Benton also denied ever threatening to arrest defendant and having any personal animus toward him.

As to November 19, 2006, Officer Benton testified she was training Officer Hart about probable cause to stop a vehicle. She pointed out a vehicle that appeared to not have a rear registration light and instructed Officer Hart to follow it. She did not recognize the car as defendant's. After following the vehicle for a half a block, the car did a quick slowdown and pulled over without signaling. Officer Benton pointed out the lack of a signal to Officer Hart. Officer Hart drove past the vehicle at 10 miles per hour, and Officer Benton had at least five seconds to observe the driver, whom she recognized as defendant. Officer Benton stated defendant was wearing a very particular kind of hat that he usually wears, and she recognized his face as well. Defendant was sitting in the vehicle and looked right at Officer Benton. She was positive only one person was in the car. In the rearview mirror, she observed defendant walk across the street. At that point, she advised Officer Hart to turn around because the businesses in the area were closed and D.R. Diggers should have been closed as well.

When they approached defendant in front of a nearby business, defendant was talking on his cellular telephone. They had not yet said anything when defendant threw his hands in the air, threw his keys on the ground, and stated the following:  "'I wasn't driving. My friend dropped me off here. I'm waiting for a cab. You didn't see me driving. You can't prove s--t.'"

In arresting defendant, Officer Hart placed the handcuffs on him while they both detained him. When they arrived at the jail, defendant went to the booking area where he had his property taken from him. He was then taken to the Intoxilyzer room. There, she witnessed Officer Hart read the warning to motorists to defendant. She also conducted a 20-minute observation period. During the period, defendant was belligerent and burping. Defendant did not vomit or regurgitate during the 20-minute period. He also did not request to go to the bathroom or spit anything out into a garbage can. Officer Benton also did not see anything in his mouth when defendant belched. When it came time to do the breath test, a little confrontation took place in getting defendant to walk to the machine. Defendant complied with her second request to walk to the machine. At the machine, Officer Benton asked defendant to take a breath test, and he refused. From the time defendant arrived at the jail until he refused the breath test, he was in Officer Benton's presence. She did not recall if he used his cellular telephone at the jail.

On December 4, 2007, the trial court entered a docket entry denying defendant's petition to rescind. The entry noted the court had questions about the witnesses' credibility but found Officer Hart's testimony credible. The court also noted the burden of proof was on defendant.

On January 2, 2008, defendant filed a notice of appeal from the trial court's December 4, 2007, ruling in accordance with Supreme Court Rules 301 and 303 (155 Ill. 2d R. 301; 210 Ill. 2d R. 303). See People v. Smith, 172 Ill. 2d 289, 294-95, 665 N.E.2d 1215, 1217 (1996) (noting "a hearing on a petition to rescind the statutory summary suspension of driving privileges is a civil proceeding").

## II. ANALYSIS

Defendant contends the trial court erred by denying his petition to rescind his statutory summary suspension.

In a hearing on a petition to rescind a statutory summary suspension, the defendant-motorist has the burden of proof to demonstrate by a preponderance of the evidence a prima facie case for rescission. People v. Ehley, 381 Ill. App. 3d 937, 943, 887 N.E.2d 772, 777-78 (2008). If the defendant establishes a prima facie case, the burden shifts to the State to present evidence justifying the suspension. Ehley, 381 Ill. App. 3d at 943, 887 N.E.2d at 778. Generally, this court will not reverse a trial court's judgment on a petition to rescind a statutory summary suspension unless it is against the manifest weight of the evidence. People v. Ewing, 377 Ill. App. 3d 585, 597, 880 N.E.2d 587, 598 (2007). "A finding is against the manifest weight of the evidence only if the opposite conclusion is clearly evident or if the finding itself is unreasonable,

- 16 -

arbitrary, or not based on the evidence presented."  People v. Deleon, 227 Ill. 2d 322, 332, 882 N.E.2d 999, 1005 (2008).

Section 2-118.1(b) of the Illinois Vehicle Code (625 ILCS 5/2-118.1(b) (West 2006)) limits the grounds upon which a petition to rescind a statutory summary suspension may be based to four.  Ehley, 381 Ill. App. 3d at 942, 887 N.E.2d at 777.  On appeal, defendant argues the trial court erred by denying his petition to rescind because two of the four grounds exist in his case.

A. Reasonable Grounds for Arrest

Defendant first alleges the arresting officer lacked reasonable grounds to believe he was driving or in actual physical control of his motor vehicle on the morning in question.  See 625 ILCS 5/2-118.1(b)(2) (West 2006).

In a driving-under-the-influence situation, "'[r]easonable grounds' is synonymous with 'probable cause.'" People v. Fortney, 297 Ill. App. 3d 79, 87, 697 N.E.2d 1, 7 (1998).  In reviewing probable-cause determinations, this court has adopted the two-part standard of review established by the United States Supreme Court in Ornelas v. United States, 517 U.S. 690, 699, 134 L. Ed. 2d 911, 920, 116 S. Ct. 1657, 1663 (1996). People v. Wear, 371 Ill. App. 3d 517, 529-30, 867 N.E.2d 1027, 1038-39 (2007).  Under that standard, a reviewing court gives deference to the trial court's findings of historical fact but

- 17 -

prescribes a de novo standard of review for the ultimate determination of probable cause. Wear, 371 Ill. App. 3d at 529, 867 N.E.2d at 1038.

To determine whether reasonable grounds and/or probable cause existed for a defendant's arrest, a court "must determine whether a reasonable and prudent person, having the knowledge possessed by the officer at the time of the arrest, would believe the defendant committed the offense." Fortney, 297 Ill. App. 3d at 87, 697 N.E.2d at 7. That standard requires the officer to have "more than a mere suspicion, but does not require the officer to have evidence sufficient to convict." People v. Long, 351 Ill. App. 3d 821, 825, 815 N.E.2d 72, 76-77 (2004). In analyzing probable cause, we utilize an objective inquiry into the police officer's conduct. People v. Lindmark, 381 Ill. App. 3d 638, 658, 887 N.E.2d 606, 623 (2008). Moreover, we note "probable cause is a fluid concept[,] turning on the assessment of probabilities in particular factual contexts." Illinois v. Gates, 462 U.S. 213, 232, 76 L. Ed. 2d 527, 544, 103 S. Ct. 2317, 2329 (1983). Thus, a probable-cause determination is a "practical, common-sense decision" that requires the consideration of the totality of the circumstances. Gates, 462 U.S. at 238, 76 L. Ed. 2d at 548, 103 S. Ct. at 2332.

Contrary to defendant's assertion, Officer Hart's testimony alone is sufficient to show he had probable cause to

- 18 -

arrest defendant for DUI.  While Officer Hart neither saw defendant drive the vehicle nor exit the vehicle, Officer Hart only observed one person in the vehicle, kept sight of the vehicle except for a U-turn, and then saw defendant walking eastbound across the street.  He did not see anyone else in the area of the vehicle.  The fact Officer Hart could not identify defendant as the driver does not negate a reasonable inference from the totality of the circumstances that defendant was the driver of the vehicle.  As Officer Hart explained, one of the reasons he did not believe defendant's claims a friend had been driving was because the officer had not observed anyone else in the vicinity.  Further, when he and Officer Benton approached defendant, defendant threw down his car keys and claimed he had not been driving.  Additionally, as they drove by the vehicle, Officer Benton indicated she knew defendant and saw him driving the vehicle.  When officers are working together, "the knowledge of each is the knowledge of all," and the arresting officer has the right to rely on the knowledge of the officer that gave the command to arrest together with his own personal knowledge.  People v. Peak, 29 Ill. 2d 343, 349, 194 N.E.2d 322, 326 (1963).  Thus, Officer Hart could rely on Officer Benton's recognition of defendant as the vehicle driver in forming probable cause to arrest defendant for DUI.

Accordingly, we find defendant failed to prove by a

preponderance of the evidence a reasonable and prudent person, having the knowledge possessed by Officer Hart at the time he arrested defendant, would have believed defendant was not the driver of the vehicle.

## B. Refusal To Submit to Testing

Defendant also asserts he did not refuse to submit to testing because the test the police offered was not in compliance with the regulations promulgated under section 11-501.2 of the Illinois Vehicle Code (625 ILCS 5/11-501.2 (West 2006)). Specifically, he asserts (1) the police did not observe him for 20 minutes before he was offered to take the Breathalyzer test and (2) he regurgitated during the 20-minute observation period and was not given the opportunity to rinse out his mouth. The State essentially contends defendant cannot raise noncompliance with the regulations because he did not submit to testing. The State's contention is a matter of first impression in Illinois. Further, it presents a matter of statutory construction, which is a question of law, and thus our standard of review is de novo. People v. Howard, 228 Ill. 2d 428, 432, 888 N.E.2d 85, 87 (2008).

The primary rule in construing a statute is to ascertain and give effect to the legislature's intent, which is best indicated by the statutory language itself. People v. O'Connell, 227 Ill. 2d 31, 36, 879 N.E.2d 315, 318 (2007). Thus, we begin our analysis by examining the relevant statutory provisions.

Section 11-501.1(a) of the Illinois Vehicle Code (Ill. Rev. Stat. 1985, ch. 95 1/2, par. 11-501.1(a) (now 625 ILCS 5/11-501.1(a) (West 2006))) is "the implied-consent statute upon which summary suspension is based." People v. Hamilton, 118 Ill. 2d 153, 158, 514 N.E.2d 965, 968 (1987). Section 11-501.1(a) provides, in pertinent part, the following:

"Any person who drives or is in actual physical control of a motor vehicle upon the public highways of this State shall be deemed to have given consent, subject to the provisions of [s]ection 11-501.2 [of the Illinois Vehicle Code (625 ILCS 5/11-501.2 (West 2006))], to a chemical test or tests of blood, breath, or urine for the purpose of determining the content of alcohol, other drug or drugs, or intoxicating compound or compounds or any combination thereof in the person's blood if arrested, as evidenced by the issuance of a Uniform Traffic Ticket, for any offense as defined in [s]ection 11-501 [of the Illinois Vehicle Code] ***." (Emphasis added.) 625 ILCS 5/11-501.1(a) (West 2006).

Section 11-501.2(a) then states, in pertinent part, the

following:

"Upon the trial of any civil or criminal action *** or proceedings pursuant to [s]ection 2-118.1 [of the Illinois Vehicle Code], evidence of the concentration of alcohol, other drug or drugs, or intoxicating compound or compounds, or any combination thereof in a person's blood or breath at the time alleged, as determined by analysis of the person's blood, urine, breath[,] or other bodily substance, shall be admissible. Where such test is made the following provisions shall apply:

1. Chemical analyses of the person's blood, urine, breath[,] or other bodily substance to be considered valid under the provisions of this [s]ection shall have been performed according to standards promulgated by the Department of State Police by a licensed physician, registered nurse, trained phlebotomist acting under the direction of a licensed physician, certified paramedic, or other individual possessing a valid permit

- 22 -

issued by that [d]epartment for this purpose. The Director of State Police is authorized to approve satisfactory techniques or methods, to ascertain the qualifications and competence of individuals to conduct such analyses, to issue permits which shall be subject to termination or revocation at the discretion of that [d]epartment[,] and to certify the accuracy of breath[-]testing equipment. The Department of State Police shall *prescribe* *regulations* *as* *necessary* *to* *implement* *this* *[s]ection*." (Emphases added.) 625 ILCS 5/11-501.2(a) (West 2006).

Section 11-501.2(a) further lists four other provisions. See 625 ILCS 5/11-501.2(a)(2) through (a)(5) (West 2006). Section 11-501.2(c)(1) addresses refusals to test and states the following:

"If a person under arrest refuses to submit to a chemical test under the provisions of [s]ection 11-501.1 [of the Illinois Vehicle Code], evidence of refusal shall be admissible in any civil or criminal action or proceeding arising out of acts alleged to

- 23 -

have been committed while the person under the influence of alcohol, other drug or drugs, or intoxicating compound or compounds, or any combination thereof was driving or in actual physical control of a motor vehicle." 625 ILCS 5/11-501.2(c)(1) (West 2006).

A reading of the plain language of the aforementioned statutory provisions indicates the testing standards of section 11-501.2(a) do apply to summary-suspension proceedings. See Hamilton, 118 Ill. 2d at 161, 514 N.E.2d at 970. However, section 11-501.2(a) expressly addresses the situation of when the person has taken a test as it states "[w]here such test is made." 625 ILCS 5/11-501.2(a) (West 2006). Thus, the admissibility of test results is conditioned on compliance with section 11-501.2(a) and the regulations promulgated thereunder. See People v. Larsen, 323 Ill. App. 3d 1022, 1026, 753 N.E.2d 378, 382 (2001). Section 11-501.2(c) addresses refusals to test and does not place any conditions on the admissibility of the re-fusal. Thus, the plain language of the provisions does not provide the admissibility of a refusal may be challenged on the basis the defendant believed the offered test would be noncompliant with section 11-501.2(a)'s standards.

Moreover, a person is subject to a summary suspension if "the person refuses testing or submits to a test that dis-

closes an alcohol concentration of 0.08 or more" or the presence of any other drug.  625 ILCS 5/11-501.1(d), (e) (West 2006). Thus, when a person has received a summary suspension due to a test, a showing of the test's invalidity under section 11-501.2(a) of the Illinois Vehicle Code (625 ILCS 5/11-501.2(a) (West 2006)) would nullify the ground upon which the summary suspension was based.  However, if the person who refused the test could show the proposed test would have been noncompliant if taken, the person has still refused the test and any potential noncompliance would not nullify the basis for the summary suspension.

In support of his argument, defendant cites <u>Hamilton</u>, in which the supreme court addressed whether a defendant seeking rescission of a summary suspension could raise the issue of noncompliance with section 11-501.2 at a rescission hearing. <u>Hamilton</u>, 118 Ill. 2d at 160, 514 N.E.2d at 969.  In analyzing the issue, the court noted its decision in <u>People v. Emrich</u>, 113 Ill. 2d 343, 351, 498 N.E.2d 1140, 1143 (1986), in which it held the failure to comply with section 11-501.2 and the regulations promulgated under it rendered the results of the chemical test inadmissible in a criminal DUI prosecution.  The <u>Hamilton</u> court extended its holding in <u>Emrich</u> to summary-suspension proceedings and found "compliance with section 11-501.2 is mandatory for summary[-]suspension purposes, [and] noncompliance will render

- 25 -

test results invalid and inadmissible." Hamilton, 118 Ill. 2d at 160, 514 N.E.2d at 969. The Hamilton court concluded a defendant must be permitted to raise the issue of noncompliance with section 11-501.2 standards at a rescission hearing, and thus challenges to the validity of the tests are permissible in such proceedings. Hamilton, 118 Ill. 2d at 161, 514 N.E.2d at 970. Thus, the Hamilton case did not address a defendant's ability to raise potential noncompliance with section 11-501.2 when challenging a refusal to submit to testing.

Accordingly, we find that, in summary-suspension proceedings, a defendant cannot raise a chemical test's potential noncompliance with section 11-501.2 of the Illinois Vehicle Code as a basis for supporting his or her refusal to submit to testing.

Defendant also challenges his refusal to test based on Goss v. People, 272 Ill. App. 3d 498, 501, 650 N.E.2d 1078, 1080 (1995), where the First District concluded that, since the police afforded the petitioner the additional right to consult with his attorney, the petitioner's insistence on additional consulting with his attorney should not have been considered a refusal to submit to the Breathalyzer test. Defendant contends the extra right afforded to him was "to present to him a test" that supposedly was in compliance with section 11-501.2's standards "prior to asking [him] whether he would submit or refuse by requiring

him to stand before the machine." (Emphases in original.) Defendant's arguments in support of that contention are unclear. Our review of the record does not reveal Officer Benton conveyed either verbally or nonverbally to defendant the test was a compliant test. We note Officer Benton's intent to ask defendant to take the test she prepared and believed was compliant with applicable standards did not afford defendant any additional rights.

Accordingly, we find the trial court's denial of defendant's rescission petition was not against the manifest weight of the evidence.

### III. CONCLUSION

For the reasons stated, we affirm the trial court's denial of defendant's petition to rescind his statutory summary suspension.

Affirmed.

MYERSCOUGH and COOK, JJ., concur.