2023 IL App (1st) 211646-U

No. 1-21-1646

Order filed December 27, 2023

Third Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 14 CR 10676 |
| | ) | |
| ELVIN PRINCE, | ) | Honorable |
| | ) | Ursula Walowski, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE D. B. WALKER delivered the judgment of the court.
Justices Lampkin and Van Tine concurred in the judgment.

**ORDER**

¶ 1    *Held*:  We affirm defendant's conviction for first degree murder over his contention that he was denied effective assistance by trial counsel's failure to file a motion to quash arrest and suppress evidence and to object during a police officer's hearsay testimony.

¶ 2    Following a jury trial, defendant Elvin Prince was found guilty of first degree murder pursuant to an accountability theory, and sentenced to 35 years in prison. On appeal, defendant contends that he was denied effective assistance of counsel by trial counsel's failure to file a

motion to quash arrest and suppress evidence and to object to a police officer's hearsay testimony about a "flash message" that "unequivocally" identified defendant as "the offender." We affirm.

¶ 3                                    I. BACKGROUND

¶ 4      Following an incident on May 19, 2014, defendant was charged under an accountability theory with the first degree murder of Kashaun Hall, the attempted first degree murders of Stefun Howard and Gerald Bauseman, and aggravated discharge of a firearm. The State proceeded on two counts of first degree murder and nol-prossed the remaining counts.

¶ 5      Prior to trial, the State filed a motion *in limine* to admit gang evidence, which the trial court granted after argument.

¶ 6      At trial, Howard testified that in May 2014, he lived in Chicago and was friends with Hall. On May 19, 2014, Tavien Butts was driving Howard and Bauseman to Howard's home when Howard noticed a silver Nissan behind them. Howard identified defendant in court as the driver of the Nissan. Defendant, whom Howard knew as "E-Dub," belonged to a "click" or a small faction of the "Money Over B******" (MOB) gang. At the time, Howard and Hall belonged to a different gang, "N****** In Action" (NIA). NIA and MOB were rivals and the two groups fought at school. Howard saw "something" in the Nissan's front passenger seat, which was angled "all the way back." Butts accelerated to evade the Nissan. He subsequently left Howard and Bauseman at Howard's home. Shortly thereafter, Howard and Bauseman left Howard's home on foot.

¶ 7      As they walked, Howard saw the Nissan by a gas station. The same person was driving. Howard and Bauseman walked to a restaurant and called Butts to ask for a ride. From the restaurant, Howard observed the Nissan circle the block. When Butts did not respond, they called

Hall and told him that E-Dub and an unidentified person were following them. Howard and Bauseman left the restaurant, met Hall, and walked to "Brian's" [1] backyard.

¶ 8    Howard heard a vehicle approaching and saw the Nissan stopped about eight feet away. Defendant was still driving. The passenger, who was wearing a black hat "all the way down" and a mask, "popped up and started shooting." The passenger was skinny, and Howard believed that the individual was a man. Howard and Bauseman fled. Hall, however, ran toward the vehicle. When Howard returned to the alley, he saw Hall on the ground bleeding. Bauseman then returned. When the police arrived, they asked if Howard saw anything and then took him to look at a silver Nissan, which he recognized as the vehicle that he previously encountered. He also went to a police station where he identified defendant in a photographic array.

¶ 9    The State entered stipulations establishing the foundation for several surveillance videos from businesses in the area. The State played the videos, which Howard narrated in court consistently with his earlier testimony, including that the Nissan arrived, and that Hall ran and then fell to the ground.

¶ 10    During cross-examination, Howard testified that the conflict between NIA and MOB had never previously escalated to shooting. While riding in Butts' vehicle, Howard observed the Nissan's driver, but only saw something black in the passenger seat. Howard described what he saw as "almost *** like a person," but acknowledged that it could also have been a "big bag." The gunshots came from the Nissan's passenger side.

¶ 11    Howard did not see defendant make gang signs or possess a firearm on the day of the shooting, but found it "suspicious" that the passenger seat was pushed all the way back. At trial,

---

[1] The report of proceedings does not contain Brian's family name.

he admitted that his grand jury testimony implied that the gunshots came from the driver's side window.

¶ 12    During redirect, Howard clarified that he testified before the grand jury that, at the time of the shooting, he saw the shooter " 'lean up' " while defendant leaned back.

¶ 13    Bauseman testified that he, Howard, and Hall belonged to NIA and were involved in a rivalry with MOB. On May 19, 2014, Butts drove Bauseman and Howard toward Howard's home. Bauseman, who was in the backseat, saw a silver vehicle behind their vehicle and Howard stated that he saw E-Dub. Bauseman did not know E-Dub. However, at trial, he identified defendant as the driver of the silver vehicle. Bauseman did not see anyone in the backseat and only saw the dreadlocks of the person in the front passenger seat. When the silver vehicle turned, defendant looked in Bauseman's direction in an "[a]ngry" manner. Defendant did not make gang signs and Bauseman did not see a firearm.

¶ 14    After Bauseman and Howard left Howard's home, Bauseman again saw the silver vehicle, still driven by defendant. Bauseman and Howard were scared, so they entered a restaurant. Howard called Hall, who met them near the restaurant. They next went to Brian's backyard, but Hall could not open the gate. Bauseman said they should leave the alley because they were being followed. He then heard a vehicle accelerate and saw the silver vehicle. Defendant was still driving. Bauseman heard someone say, "hey, hey, hey," saw a firearm emerge from a window of the silver vehicle, and ran. He heard four or five gunshots. The person in the passenger seat had the firearm, not defendant. Bauseman ran when he heard the first gunshot.

¶ 15    Bauseman hid briefly. Then, he returned to the alley and observed that Hall was hurt. When police arrived, Bauseman told them that his friend had been shot, but was too distraught to say

more. Later, at a police station, he told officers what happened and identified defendant in a photographic array. Because he was scared, he told police he did not belong to NIA.

¶ 16    During cross-examination, Bauseman acknowledged that he did not call the police to report that someone was following him. While defendant looked at Bauseman, defendant did not make a gang sign, speak, or point a firearm. Bauseman did not see the shooting; rather, he saw the firearm emerge from the silver vehicle and then ran.

¶ 17    Chicago police officer Brett Kellam testified that around 5 p.m. on May 19, 2014, he heard a "flash message" of a "person shot." Additional information indicated that a silver Nissan and two black men, one with dreadlocks and one with a mask, were possibly involved. In another message, he learned that one of the men was named "E-Dub" and could be "Ethan Prince," who lived around 79th Street and St. Louis. Officer Kellam then relocated to 7900 St. Louis Avenue.

¶ 18    Officer Kellam drove south on Kedzie, then turned westbound on 79th toward St. Louis. He explained that Kedzie and St. Louis were parallel to each other and that Kedzie was three blocks east of St. Louis. Officer Kellam then observed a black man with dreadlocks run across the street onto a concrete "planter area" with trees and shrubs. Officer Kellam exited his vehicle to investigate. He identified defendant in court as the person who ran across the street. Officer Kellam asked defendant his name and upon hearing the answer "Elvin Prince" took him into custody. A cell phone, wallet, state identification card, and vehicle keys were recovered from defendant during a custodial search. No weapons were recovered. When additional officers arrived, Officer Kellam gave the keys to Officer Daniel Sullivan. Defendant was taken to a police station.

¶ 19    During cross-examination, Officer Kellam clarified that the initial "flash message" stated, "person shot." He then drove toward the direction of the shooting. At some point, another message

stated that two black men, one with a mask and one with dreadlocks, were involved. When Officer Kellam saw defendant running to the concrete planter, defendant was alone. Officer Kellam believed defendant could be Ethan Prince, but defendant identified himself as Elvin Prince, which was corroborated by defendant's identification.

¶ 20 Chicago police officer Daniel Sheehan testified that after arriving at 79th and St. Louis, Sullivan gave him a vehicle key and fob. Officer Sheehan recognized the keys as belonging to a Nissan. He drove southward, the direction from which defendant came, and clicked the "button" to see if any vehicles lit up or unlocked. Approximately 10 minutes later, Officer Sheehan found a vehicle that responded to the key fob. He informed other officers but did not touch the vehicle. The State then published a video from a residence, which Officer Sheehan asserted depicted the events he had just described.

¶ 21 The State then presented testimony establishing that the Nissan was photographed between 8 and 8:30 p.m. on May 19, 2014, and that shortly thereafter a gunshot residue (GSR) test was administered to defendant at a police station. A forensic investigator next testified that the Nissan was dusted for fingerprints and swabbed for DNA evidence and that a GSR test was performed on the Nissan's passenger side. A retired trace evidence analyst testified that defendant's GSR test was negative, and that the Nissan's front passenger side and roof tested positive for GSR.

¶ 22 The State next entered stipulations establishing that defendant's DNA was collected, that DNA analysis on the samples taken from the Nissan identified a mixture of DNA profiles originating from at least three people, and that a major male DNA profile was identified from this mixture from which defendant could not be excluded. The chances that a person in the general population would have the major DNA profile identified in the sample recovered from the front

driver's side of the vehicle was approximately 1 in 2 quintillion blacks, 1 in 53 quintillion whites, or 1 in 140 quintillion Hispanic unrelated individuals. The State entered an additional stipulation establishing that defendant's arms were photographed; the photographs, which were published and are included in the record on appeal, show tattoos stating "EDUB" and "Money Over B******." The State then entered an Illinois Secretary of State certified driver's record abstract for defendant, with a date of birth of September 25, 1996, and an address in the 3500 block of West 79th Place.

¶ 23 Chicago police detective Daniel Gorman testified that on May 19, 2014, Howard identified a Nissan parked on the street as the vehicle from which a person leaned out of the passenger side and shot Hall. Howard and Bauseman separately identified defendant in photographic arrays as the Nissan's driver.

¶ 24 At the close of evidence, the defense moved for a directed verdict, which the trial court denied. Following closing arguments, the jury found defendant guilty of first degree murder.

¶ 25 Defendant then retained new counsel. Posttrial counsel filed a motion and supplemental motion for a new trial raising numerous ineffective assistance claims. Relevant here, the motion alleged that trial counsel failed to file a motion to quash arrest and suppress evidence based upon a lack of probable cause to stop and search defendant when defendant was stopped while crossing the street, there was no warrant for his arrest, and there was no evidence that the officer knew defendant.

¶ 26 The trial court held a hearing on defendant's motion and supplemental motion for a new trial. We relate only the testimony relevant to the issues before this court. Nichole Massarello testified that she and Tod Urban represented defendant at trial.[2] Urban was lead counsel and

---

[2] The hearing occurred on three days in April, June, and August 2021.

Massarello served as second chair. No investigator was hired and no motion to suppress was filed. During cross-examination, Massarello testified that defendant's trial was not the first murder trial in which she participated, but Urban decided whether to stipulate to evidence or file motions.

¶ 27 Urban testified that he had been a licensed attorney in Illinois for 37 years and his practice was wholly criminal law. He was retained by defendant's parents on December 4, 2014. He could not find his case file, did not "recall this case," and did not have "any independent recollection" of its details. Urban did not recall hiring a private investigator and did not file a motion to quash arrest and suppress evidence.

¶ 28 Posttrial counsel asked that the hearing be continued so that Urban could locate his trial file. The State did not object. The trial court agreed, but asked the State to cross-examine Urban on his testimony so far.

¶ 29 During cross-examination, Urban stated that, when determining whether to file a motion to quash arrest and suppress evidence, he reviews the discovery and does not file frivolous motions. In every murder case, he considers whether an exception to the warrant requirement permits the introduction of evidence obtained through a warrantless arrest and search. At the next date, Urban testified that he could not locate his case file.

¶ 30 In closing argument, posttrial counsel argued that it was the "norm" to file a motion to suppress to "get more information" and that there was "nothing you can lose" by examining the arresting officer as to why defendant was stopped, what defendant wore, and why he was searched.[3]

---

[3] Posttrial counsel also argued that the suppression motion would have been meritorious because *People v. Bass*, 2019 IL App (1st) 160640, *aff'd in part, vacated in part*, 2021 IL 125434, was good law.

¶ 31 The trial court denied defendant a new trial, finding, relevant here, that a motion to quash arrest and suppress evidence would not have succeeded. Probable cause for a stop existed pursuant to *Terry v. Ohio*, 392 U.S. 1 (1968), when defendant was stopped minutes after a shooting "in the area," and defendant, who had dreadlocks, matched the description given, and his name was related over the radio. Posttrial counsel made an oral motion to reconsider, which the trial court denied.

¶ 32 On December 13, 2021, following argument, the trial court imposed a 35-year sentence for first degree murder. Defendant filed a motion to reconsider sentence, which the trial court denied.

¶ 33 II. ANALYSIS

¶ 34 A. *Failure to File Motion to Quash Arrest and Suppress Evidence*

¶ 35 On appeal, defendant first contends that he was denied effective assistance when trial counsel failed to file a motion to quash arrest and suppress evidence. Defendant argues that the motion would have been meritorious as Officer Kellam did not have reasonable suspicion to execute a *Terry* stop when he stopped defendant because he matched the "vague" description of the offender related in a "flash message."

¶ 36 When evaluating a claim of ineffective assistance, we apply a two-prong test under which the defendant must prove his counsel's performance fell below an objectively reasonable standard and that the deficient performance prejudiced him. *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984). A defendant's failure to satisfy either prong precludes a finding of ineffectiveness. *People v. Simpson*, 2015 IL 116512, ¶ 35. We review whether a defendant received ineffective assistance of counsel *de novo*. *People v. Johnson*, 2021 IL 126291, ¶ 52.

---

This assertion was incorrect. Defendant's jury trial began on May 20, 2019, and concluded on May 23, 2019. *Bass* was filed on July 25, 2019.

¶ 37    "To establish deficient performance, the defendant must overcome the strong presumption that counsel's action or inaction was the result of sound trial strategy." *People v. Perry*, 224 Ill. 2d 312, 341-42 (2007). Acts or omissions by counsel will not be considered matters of strategy, however, where no sound tactical reason could conceivably support the act or omission. *People v. Nunez*, 263 Ill. App. 3d 740, 748 (1994). To establish prejudice, a defendant must establish there is a reasonable probability that, but for counsel's unreasonable performance, the result of the proceeding would have been different. *People v. Gayden*, 2020 IL 123505, ¶ 27.

¶ 38    The decision to file a motion to suppress is generally a matter of trial strategy entitled to great deference. *Id.* ¶ 28. To establish ineffective assistance based on counsel's failure to file such a motion, a defendant must show that the unargued motion was meritorious and that a reasonable probability exists that the trial outcome would have been different had the evidence been suppressed. *Id*. It is the defendant's burden to establish a factual basis for an ineffective assistance claim. *People v. Burnett*, 2019 IL App (1st) 163018, ¶ 16.

¶ 39    Here, defendant contends that a motion to quash arrest and suppress evidence would have been successful, as Officer Kellam stopped him merely because he was a black man with dreadlocks running across the street. He notes that Officer Kellam did not testify to any prior encounters with defendant or identify the "original source" of the identifying information, and concludes that the "vague description" of the offender was an insufficient basis for a *Terry* stop.

¶ 40    An arrest made without probable cause violates the prohibitions against unreasonable searches and seizures under the United States and Illinois constitutions. *People v. Lee*, 214 Ill. 2d 476, 484 (2005). Pursuant to *Terry*, however, a police officer may briefly detain a person for investigatory purposes if the officer reasonably believes the person has committed or is about to

commit a crime. *People v. Thomas*, 198 Ill. 2d 103, 108-09 (2001) (citing *Terry*, 392 U.S. at 22); see also 725 ILCS 5/107-14(a) (West 2014).

¶ 41    Reasonable suspicion arises when an officer sees unusual conduct which leads the officer reasonably to conclude in light of his or her experience that criminal activity may be afoot. *People v. Jenkins*, 2021 IL App (1st) 200458, ¶ 47. Reasonable suspicion is a "low bar." *People v. Patel*, 2020 IL App (4th) 190917, ¶ 25. "[T]he evidence necessary to justify a *Terry* stop need not rise to the level of probable cause and can even arise when no violation of the law is witnessed; however, a mere hunch is insufficient." *People v. Maxey*, 2011 IL App (1st) 100011, ¶ 46. Rather, officers may rely on their training and experience and make inferences that would elude an untrained person. *People v. Leighty*, 362 Ill. App. 3d 258, 261 (2005).

¶ 42    In order to justify an investigatory stop, the police officer must be able to point to specific, articulable facts, which, taken with rational inferences therefrom, reasonably warrant the intrusion. *Thomas*, 198 Ill. 2d at 109 (citing *Terry*, 392 U.S. at 20-21). In determining whether a stop is reasonable, an objective standard is used in which the court considers the totality of the facts and circumstances from the perspective of a reasonable officer at the time of the stop. See *People v. Sanders*, 2013 IL App (1st) 102696, ¶ 14. Further, pursuant to the collective knowledge doctrine, "information known to all of the police officers acting in concert can be examined when determining whether the officer initiating the stop had reasonable suspicion to justify a *Terry* stop." *People v. Ewing*, 377 Ill. App. 3d 585, 593 (2007); see also *People v. Fonner*, 385 Ill. App. 3d 531, 541 (2008) (quoting *People v. Peak*, 29 Ill. 2d 343, 349 (1963) (when officers work together, " 'the knowledge of each is the knowledge of all' ")).

¶ 43    *People v. Lozano*, 2023 IL 128609, is instructive. There, our supreme court determined that the "act of running in the rain while holding the front of [a] pocket" did not provide police officers with reasonable suspicion to stop a person. *Id.* ¶¶ 1, 37-43.

¶ 44    In that case, an officer testified at the hearing on the defendant's motion to suppress evidence that, at the time he encountered the defendant, the defendant was running and appeared to be holding his front pocket. *Id.* ¶ 5. The officer acknowledged that he was not responding to a specific report of a crime or 911 call, and that it was raining. *Id.* ¶¶ 5-6. He did not observe the defendant committing any crime and the defendant was already running at the start of the encounter. *Id.* ¶ 6, 8. The officer tried to stop the defendant because he wanted to know why the defendant was running. *Id.* ¶ 8. Then, after stopping the defendant and observing a " 'big bulge' " in the defendant's pocket, the officer wanted to determine " 'what was the bulge.' " *Id.* ¶¶ 7, 8.

¶ 45    Based on the facts of that case, our supreme court determined that the officers lacked reasonable suspicion to stop the defendant. *Id.* ¶ 39. The court noted that the officer did not testify that he was responding to a specific report of a crime, did not describe the neighborhood as a "high-crime area," and acknowledged that the defendant was already running when the encounter began. *Id.* Rather, the officer "simply wanted to know why [the] defendant was running and what item caused a bulge in [the] defendant's pants." *Id.* The court therefore concluded that the facts known to the officer at the time of stop were insufficient, and the stop itself was "unlawful." *Id.* ¶ 40.

¶ 46    Here, however, Officer Kellam received information that a person was shot and that two black men, one with dreadlocks and one with a mask, and a silver Nissan were involved. He thereafter learned that one of the men went by the nickname E-Dub and could be "Ethan Prince," who lived around 79th and St. Louis. Officer Kellam relocated to the 7900 block of St. Louis

where he saw a black man with dreadlocks run across the street onto a concrete planter with trees and shrubs. In other words, after receiving information that a black man with dreadlocks who lived near a certain intersection was possibly involved with a shooting, Officer Kellam relocated to that area and saw defendant, a black man with dreadlocks, run across the street into the shrubbery-covered median. See *People v. Bennett*, 376 Ill. App. 3d 554, 563-64 (2007) (finding that a radio transmission of a " 'man down' " and a description of the offender as a black man wearing a black hoodie running north on a certain street provided reasonable suspicion to stop the defendant, who matched the description and was running on the same street).

¶ 47     While defendant's behavior could have had an innocent explanation, "[r]easonable suspicion does not require an officer to 'rule out the possibility of innocent conduct.' " *Jenkins*, 2021 IL App (1st) 200458, ¶ 47 (quoting *United States v. Arvizu*, 534 U.S. 266, 277 (2002)). Additionally, reasonable suspicion can be partially based on an officer's observation of an individual similar to one believed to be fleeing the scene of a recent offense when the individual is located in the general area where the fleeing suspect is expected to be, given the time of the offense, and the distance from the scene. See *People v. Rivera*, 272 Ill. App. 3d 502, 506 (1992). Here, Officer Kellam observed a man who matched the description of the offender running across the street as Officer Kellam traveled to the area where the offense occurred. Moreover, the man was running in the area identified in the "flash message" as being where he lived. Thus, Officer Kellam had reasonable suspicion to effectuate a *Terry* stop. See *Thomas*, 198 Ill. 2d at 109 (to justify an investigatory stop, the officer must be able to point to specific, articulable facts, which, taken with rational inferences therefrom, reasonably warrant the intrusion).

¶ 48    Defendant, however, argues that no reasonable suspicion existed because Officer Kellam acted on an anonymous tip and did not testify to previous encounters with defendant. He notes that the record is "silent" as to who related the description of the offenders to officers, and argues that the "vague" quality of the information was insufficient to provide reasonable suspicion. We observe, however, that Officer Kellam was not asked at trial about the source of the description of the offenders. Consequently, the record before this court does not clearly establish whether Officer Kellam acted on an anonymous tip, the contents of the tip, or whether Officer Kellam had previously interacted with defendant.

¶ 49    Moreover, the record does not reveal whether the information transmitted in the "flash messages" was the only information known to Chicago police officers at the time of the messages' transmittal. That is, there would be no reason for a "flash message" to include the identity of the person or people who identified and described the offender. Officer Kellam relied on the information contained in the messages, and pursuant to the collective knowledge doctrine, the facts known to the officers at the scene could be considered when determining whether there was reasonable suspicion to justify a *Terry* stop. See *Ewing*, 377 Ill. App. 3d at 593.

¶ 50    However, the record does not contain these details because defendant's arrest was not challenged in the trial court. See *Gayden*, 2020 IL 123505, ¶¶ 30, 33 (finding that where "the circumstances leading up to and surrounding" an arrest were not at issue, the State did not have to establish "justification" for the arrest). Consequently, we cannot agree with defendant's conclusion that the lack of evidence in the record as to these issues must be resolved in his favor. See *Burnett*, 2019 IL App (1st) 163018, ¶ 14 ("The lack of evidence *currently in the record* concerning probable

cause and the officers' pre-arrest beliefs cannot be equated with fact—that there *was no evidence* to support a probable cause determination." (emphasis in original)).

¶ 51 We are similarly unpersuaded by defendant's reliance on *People v. Washington*, 269 Ill. App. 3d 862 (1995). There, the defendant filed a motion to quash arrest and suppress evidence and presented two witnesses at the hearing on the motion. *Id.* at 864. The trial court granted the State's motion for a directed finding. *Id.*

¶ 52 At trial, two officers testified that they approached the defendant because he "fit the description" of a robbery suspect that they received by radio dispatch. *Id.* at 864-65. The trial court subsequently vacated its ruling on the motion to quash arrest and suppress evidence and allowed the State to make an offer of proof. *Id.* at 865-66. The State proffered that a police officer would testify that he received a " 'flash message' " that a " 'male black wearing a blue coat and black hat' " fled west toward a park. The officer arrived at the park two minutes later and observed the defendant, a black man, wearing " 'a blue coat and a black hat.' " *Id.* at 866. The trial court granted the defendant's motion, ordered a mistrial, and the State appealed. *Id.*

¶ 53 On appeal, this court affirmed, as the only evidence introduced to explain the defendant's detention was that he " 'fit the description' " of an offender. *Id.* There was no testimony as to the "specific description" of the offender's physical characteristics or clothing and no testimony as to the defendant's appearance or clothing at the time of the stop. *Id.* Moreover, absent the offer of proof, the record did not include the suspect's gender or race. *Id.* Accordingly, the trial court "had no opportunity to determine whether the description of the offender and the physical characteristics of the defendant were similar enough to justify the detention of the defendant." *Id.*

¶ 54    This court further noted "albeit parenthetically" that the details in the offer of proof were insufficient to justify the stop of the defendant. *Id*. at 868; see *People v. Miller*, 355 Ill. App. 3d 898, 904 n.1 (2005) (declining to consider the parenthetical finding in *Washington*); *People v. Booker*, 2015 IL App (1st) 131872, ¶ 49 n.3 (same). The offer of proof stated that the offender was a " 'male black wearing a blue coat and black hat' " without detailing the offender's complexion, whether he had facial hair or wore glasses, and the type or style of the coat and hat. *Washington*, 269 Ill. App. 3d at 868. We highlighted that the defendant testified that he was wearing a " 'a blue Chicago Bears "starter jacket" ' " at the time of the stop, which was a "distinctive and readily discernible item of apparel." *Id.*

¶ 55    In this case, however, Officer Kellam testified that the description in the "flash message" included gender, race, and hairstyle and that defendant matched those descriptors. Additionally, defendant was stopped shortly after the offense by the officer who was traveling toward the area where the offense occurred and in the same neighborhood where the "flash messages" stated that the offender lived. These details distinguish the facts of this case from those in *Washington*. Here, based upon the record at trial, the information available to Officer Kellam at the time of the stop provided Officer Kellam with reasonable suspicion to stop defendant: defendant matched the description that Officer Kellam received of a black male with dreadlocks, and defendant was seen running in the area of the offense shortly after it occurred. See *Sanders*, 2013 IL App (1st) 102696, ¶ 14.

¶ 56    As Officer Kellam's stop of defendant was not improper, defendant cannot establish that he was prejudiced by trial counsel's failure to file a motion to quash arrest and suppress evidence. See *People v. Moore*, 2012 IL App (1st) 100857, ¶ 45 ("Defense counsel is not required to make

losing motions or objections in order to provide effective legal assistance."). His ineffective assistance claim therefore fails. *Simpson*, 2015 IL 116512, ¶ 35 (the failure to establish either prong of the *Strickland* test is fatal to an ineffective assistance claim).

¶ 57                                 B. *Failure to Object to Testimony*

¶ 58    Defendant next contends that he was denied effective assistance by trial counsel's failure to object to Officer Kellam's testimony that the "flash message" stated that a black man with dreadlocks, known as E-Dub and "Ethan Price," was connected to the shooting. He asserts there was no strategic reason for trial counsel's failure to object and that he was prejudiced by this "third eyewitness" identification testimony.

¶ 59    The State responds that defendant has forfeited this contention for failure to raise it before the trial court and asks for plain error review before this court. However, a party may properly raise a claim of ineffective assistance for the first time on appeal. See *People v. Jefferson*, 2021 IL App (2d) 190179, ¶ 26. Accordingly, we will address the merits of defendant's contention.

¶ 60    As discussed, to establish a claim of ineffective assistance, a defendant must demonstrate that trial counsel's performance fell below an objective standard of reasonableness, and there is a reasonable probability that, but for the complained-of actions, the result of the proceeding would have been different. *Gayden*, 2020 IL 123505, ¶ 27. "If it is easier to dispose of an ineffective assistance claim on the ground that it lacks sufficient prejudice, then a court may proceed directly to the second prong and need not determine whether counsel's performance was deficient." *People v. Givens*, 237 Ill. 2d 311, 331 (2010) (citing *Strickland*, 466 U.S. at 697). In the case at bar, we can dispose of defendant's claim of ineffective assistance on the prejudice prong alone. See, *e.g.*, *People v. Smith*, 195 Ill. 2d 179, 188 (2000) ("If a defendant cannot establish that he suffered

prejudice, a court need not determine whether counsel's performance was constitutionally deficient.").

¶ 61    Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Ill. R. Evid. 801(c) (eff. Oct. 15, 2015). "The determination of whether a statement constitutes inadmissible hearsay does not focus upon the substance of the statement, but rather the purpose for which the statement is being used." *People v. Williams*, 181 Ill. 2d 297, 313 (1998). We review *de novo* whether testimony constitutes hearsay. *People v. Gladney*, 2020 IL App (3d) 180087, ¶ 20.

¶ 62    An exception to the general rule against hearsay applies when a statement is offered "for the limited purpose of showing the course of a police investigation where such testimony is necessary to fully explain the State's case to the trier of fact." *Williams*, 181 Ill. 2d at 313. A police officer may testify to out-of-court conversations "when such testimony is not offered to prove the truth of the matter asserted \*\*\*, but is used to show the investigative steps taken by the officer." *People v. Simms*, 143 Ill. 2d 154, 174 (1991); see also *People v. Jones*, 153 Ill. 2d 155, 159-61 (1992) (a police officer may testify about certain conversations, including their substance, to establish the course of an investigation rather than to prove the truth of the matter asserted, as long as the testimony does not go to the "very essence of the dispute"). This is because statements by a police officer which explain the investigatory process are not offered to prove the truth of the matter asserted. *People v. Armstead*, 322 Ill. App. 3d 1, 12 (2001). To prevent police officers from explaining their conduct during an investigation puts them "in the false position of seeming just to have happened upon the scene." (Internal quotation marks omitted.) *People v. Cameron*, 189 Ill. App. 3d 998, 1004 (1989).

¶ 63    "Accordingly, a police officer may testify about a conversation that he had with an individual and his actions pursuant to the conversation to recount the steps taken in his investigation of the crime." *People v. Ochoa*, 2017 IL App (1st) 140204, ¶ 41. "However, the police officer may not testify to information beyond what was necessary to explain the officer's actions." *Id*.

¶ 64    Here, defendant contends that Officer Kellam's testimony that "flash messages" stated that the offender was a black man with dreadlocks who went by the nickname "E-Dub," had the legal name "Ethan Prince," and resided at 79th and St. Louis went to the very essence of the dispute, that is, identified defendant as the offender.

¶ 65    We find *People v. Temple*, 2014 IL App (1st) 111653, to be instructive. In that case, following a jury trial, the defendant was found guilty of first degree murder, attempted first degree murder, and aggravated battery with a firearm. *Id*. ¶ 1. On appeal, the defendant first challenged as inadmissible hearsay an officer's testimony that, after receiving information from witnesses, a "flash message" was issued for a white man named Michael Temple, with the nickname of White Mike. *Id*. ¶ 59. This court agreed that the "naming" of the defendant in the "flash message" was not " 'necessary to fully explain' " the course of the investigation. Nevertheless, this court found any error was harmless because prior to the officer's testimony another witness testified that the defendant was the shooter and that he told the police that the defendant was the shooter. *Id*. Therefore, the officer's "improper testimony" about the "flash message" "simply duplicated properly admitted evidence." *Id*.

¶ 66    The defendant also challenged a second officer's testimony that, after responding to a call of "shots fired," the officer received information which included a description of the offender's

vehicle and the name of a person wanted in connection with the shooting. *Id.* ¶ 60. That officer further testified that he obtained "last whereabouts" of the suspect and relocated to that area, where he observed a vehicle matching the description of offender's vehicle. (Internal quotation marks omitted.) *Id.* We found that testimony to be properly admitted as the officer's statements regarding the description of the vehicle and the suspect's last known whereabouts were necessary to explain why the officer proceeded to that area and how he identified the vehicle used in the shooting. *Id.* We noted that the officer did not "give any specifics of the description or the suspect[']s name," but only testified to the extent necessary to explain his actions after receiving the information. *Id.* Therefore, the officer's testimony fell within the scope of the police procedure exception to the hearsay rule. *Id.*

¶ 67 Similarly, here, the State did not introduce Officer Kellam's testimony regarding the "flash messages" to establish that defendant was actually involved in the offense, but rather to explain Officer Kellam's presence in the area where defendant was taken into custody. See *Temple*, 2014 IL App (1st) 111653, ¶¶ 58, 60. Absent Officer Kellam's testimony regarding the "flash messages," there would have been no explanation as to how he came to be in the vicinity of 79th and St. Louis or why he stopped to speak to defendant. See, *e.g.*, *Cameron*, 189 Ill. App. 3d at 1004 (an officer should be able to explain the officer's presence and conduct rather than just seeming to appear at the scene). As in *Temple*, however, the additional testimony detailing that defendant was named in the flash message was not necessary to fully explain the course of the investigation.

¶ 68 Nonetheless, "[i]nadmissible hearsay does not require reversal where there is no reasonable probability the jury would have found the defendant not guilty had the hearsay been excluded."

*Ochoa*, 2017 IL App (1st) 140204, ¶ 58. " 'When examining whether the admission of hearsay was harmless, reviewing courts must ask whether there is a reasonable probability that the trier of fact would have acquitted the defendant had the hearsay been excluded.' " *Id.* (quoting *In re Jovan A.*, 2014 IL App (1st) 103835, ¶ 37).

¶ 69    Here, prior to Officer Kellam testifying, defendant was identified as the driver of the Nissan by Howard and Bauseman. Defendant makes no argument that Howard's and Bauseman's identifications were improperly admitted. Therefore, as in *Temple*, any impropriety in Officer Kellam's testimony detailing that defendant was named in the "flash message" simply duplicated properly admitted evidence—that defendant was the driver of the Nissan—and there is no reasonable probability that the jury would have acquitted defendant had Officer Kellam's complained-of testimony been excluded. See *Ochoa*, 2017 IL App (1st) 140204, ¶ 58.

¶ 70    As there is no reasonable probability that the jury would have found defendant not guilty absent Officer Kellam's complained-of testimony, defendant cannot establish he was prejudiced by trial counsel's failure to object. *Gayden*, 2020 IL 123505, ¶ 27. Therefore, his claim of ineffective assistance must fail. See *Simpson*, 2015 IL 116512, ¶ 35 (the failure to establish either prong of the *Strickland* test is fatal to an ineffective assistance claim).

¶ 71    Defendant finally contends that he was denied effective assistance by trial counsel's cumulative errors. However, as he has not established that he was prejudiced by either of counsel's complained-of inactions, he has not established that he was denied effective assistance. See *id.*

CONCLUSION

¶ 72    For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

¶ 73    Affirmed.